**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES CODY, | ) | |
| JASMINE BORDEN, | ) | |
| VINCENT GROVER, | ) | |
| JOHN DOE, | ) | |
| JOHN ROE[1], | ) | |
| MICHAEL MOSLEY, and | ) | |
| DIEDRE WORTHAM, | ) | |
| on behalf of themselves and all others | ) | No. 4:17-cv-2707-AGF |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF ST. LOUIS, | ) | |
| for and on behalf of the | ) | |
| MEDIUM SECURITY INSTITUTION | ) | |
| a.k.a. | ) | |
| "THE WORKHOUSE," | ) | |
| | ) | |
| Defendant. | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**INTRODUCTION**

1.      The City of St. Louis daily condemns hundreds of presumptively innocent people

to suffer in unspeakably hellish and inhumane conditions inside of its Medium Security

Institution (MSI). On any given day, detainees in the jail must endure infestations of rats, snakes,

cockroaches, and other insects; extreme temperatures ranging from stifling heat in the summers

to frigid cold in the winters; inconsistent and inadequate provision of medical care and mental

health treatment; poor air quality and proliferation of mold caused by the jail's lack of ventilation

and inadequate sanitation; overcrowding; insufficient staffing; and a culture of fear created by

---

[1] Plaintiffs John Doe and John Roe bring these claims under pseudonyms due to fear of
retaliation, reputational harm, and social stigma.

frequent violence and retaliation, including by jail staff. These conditions not only violate the United States Constitution, but also run afoul of the most basic standards of human decency.

2.      So squalid are the conditions that persist at MSI that local residents have adopted a name for the jail that borrows from the long-abolished Victorian institution for the most impoverished and destitute: the Workhouse[2].

3.      The overwhelming majority of Workhouse detainees have not been convicted of any crime. They are being held prior to any determination of guilt or innocence solely because they lack the funds to purchase their freedom. Thus, thousands of poor and black defendants have been forced to suffer the deplorable conditions of the Workhouse without any meaningful inquiry into their ability to pay by the court or lawyer to argue against the imposition of cash bail.

4.      Plaintiffs bring this complaint on behalf of themselves and all others similarly situated for monetary damages as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

5.      This is a civil rights action arising under 42 U.S.C. §1983, 28 U.S.C. § 2201, *et seq.*, and the First, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the Defendant is located in this District and the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

7.      Plaintiff James Cody is a 43-year-old black man and a resident of Jefferson City, Cole County, Missouri. Mr. Cody was held in the Workhouse as a sentence for a technical

---

[2] "New records cast light on life in Victorian workhouses," August 19, 2010, http://www.bbc.com/news/uk-wales-11015965.

probation violation from January 3, 2017 to on or around September 13, 2017. During this period, Mr. Cody was subjected to various unconstitutional conditions as described herein.

8.      Plaintiff Jasmine Borden is a 32-year old black woman and a resident of St. Louis City. Ms. Borden was a pretrial detainee at the Workhouse from May 15, 2017 to July 22, 2017. During this period, Ms. Borden was subjected to various unconstitutional conditions as described herein. Ms. Borden's charges were dismissed on August 8, 2017 and reissued on August 11, 2017, resulting in her re-arrest.

9.      Plaintiff Vincent Grover is a 42-year-old black man and a resident of St. Louis City. Mr. Grover was a pretrial detainee at the Workhouse from May 17, 2017 to on or about August 16, 2017. During this period, Mr. Grover was subjected to various unconstitutional conditions as described herein.

10.      Plaintiff John Doe is a 43-year-old black man and a resident of St. Louis City. Mr. Doe was a pretrial detainee at the Workhouse from June 29, 2017 to on or about July 31, 2017. During this period, Mr. Doe was subjected to various unconstitutional conditions as described herein.

11.      Plaintiff John Roe is a 25-year-old black man and a resident of St. Louis City. Mr. Roe was a pretrial detainee at the Workhouse from July 3, 2017 to October 3, 2017. During this period, Mr. Roe was subjected to various unconstitutional conditions as described herein.

12.      Plaintiff Michael Mosley is a 25-year-old black man and a resident of St. Louis City. Mr. Mosley was a pretrial detainee at the Workhouse from June 4, 2017 to July 1, 2017. During this period, Mr. Mosley was subjected to various unconstitutional conditions as described herein.

13.      Plaintiff Diedre Wortham is a 46-year-old black woman and a resident of St.

Louis County. Ms. Wortham was a pretrial detainee at the Workhouse from July 18, 2017 to

August 9, 2017. During this period, Ms. Wortham was subjected to various unconstitutional

conditions as described herein.

14.    The Defendant City of St. Louis is a political and geographic subdivision of the

state of Missouri and organized under state law. The City oversees operations of the Workhouse

through the Division of Corrections within the Department of Public Safety.

## FACTS

### I.    INDIVIDUAL PLAINTIFFS' ALLEGATIONS

**James Cody**

15.    Plaintiff James Cody estimates that during the hottest days of July 2017,

temperatures inside of his Workhouse dorm reached 130 degrees. Mr. Cody recalls sweating so

profusely in the dorm that he cycled through four to five shirts each day.

16.    Workhouse staff sometimes employed minimal measures to mitigate the impact of

the extreme heat conditions on Mr. Cody and others. On other occasions, Workhouse officials

failed to provide *any* accommodations to mitigate the impact of the heat.

17.    Mr. Cody developed a heat rash during the extreme heat conditions in the

Workhouse, including visible blisters on his hands and upper leg area. He used toothpaste in an

attempt to treat the rash but grew concerned about contracting staph infection due to the

unsanitary conditions in the facility. Mr. Cody continues to suffer with the blisters and rash

today, which he treats with a triple antibiotic and calamine lotion, respectively.

18.    Mr. Cody also developed ringworm on his Achilles tendon while in the

Workhouse. The heat and moisture in the facility caused the infection to spread to the back of his

heel and up his leg. The infection is only now subsiding, after months of effort by Mr. Cody to

treat and manage the symptoms. Mr. Cody does not have health insurance and has been unable to receive professional medical treatment for this condition.

19.     During his time in the Workhouse, Mr. Cody regularly observed mice and cockroaches throughout his dorm.

20.     On one occasion, he found mouse feces on his food tray. In fact, this was such a frequent problem for detainees that the kitchen was closed while he was confined. Detainees who now work in the kitchen are simply told to remove any pieces of cake that contain mouse feces and to preserve the rest.

21.     Mr. Cody recalls that mice were a constant nuisance throughout the facility; they would jump into the laundry and onto the beds at night, and lived inside of the walls and vents. When Mr. Cody asked a maintenance worker how he intended to solve the mice infestation, the worker stated that the temporary air-conditioning units installed in July would freeze the mice out and, if that did not work, the mice would die in the winter.

22.     The detainee sinks and showers overflowed on several occasions while Mr. Cody was in the Workhouse. He estimates that his dorm was flooded approximately ten times during this period.

23.     Because of the lack of window panes in his dormitory, Mr. Cody was rained on while he tried to sleep in his bed. The open windows also exposed him and his fellow detainees to mosquitoes and other insects.

24.     Another major concern for Mr. Cody during his time in the Workhouse was the shortage of officers and their inability or unwillingness to prevent the outbreak of violence in the dorms.

25.     Mr. Cody sometimes observed a single officer trying to supervise two or three

dorms with 70 men each. When violence would erupt, it was impossible for these officers to intervene and prevent serious harm.

26.     Some officers perpetuated a culture of violence by encouraging detainees to fight each other.

27.     Because of the City's failure to address the dangerous, unsanitary, and inhumane conditions that Mr. Cody experienced in the Workhouse, he regularly feared for his safety, experienced sleeplessness due to the unbearable heat conditions and frequently worried about contracting diseases while detained in the facility.

**Jasmine Borden**

28.     Plaintiff Jasmine Borden was detained in the Workhouse from May 15, 2017 until July 22, 2017 on a $500 bond that she could not pay.

29.     Unlike the male dormitories, the female units where Ms. Borden was housed had air conditioning. Sometime in early June, however, the air conditioner broke, causing her cell to become hot and stuffy and leaving her in a constant sweat.

30.     While the female detainees were supposed to receive ice every shift, they typically only received ice about once per day. A cooler was typically filled with ice and placed in the communal area. Some days there was no ice, and staff stated that the ice machine was broken.

31.     The women were required to provide their own cups for the ice. Some women did not have cups, since they had to be purchased from commissary. Those who had no money could not get a cup and therefore had no access to the ice provided. A female detainee who was leaving the Workhouse left her cup with Ms. Borden, which is the only reason that she was able to get ice.

32.     Ms. Borden observed detainees in her dorm suffer health complications from the extreme heat in the facility. One such detainee, who was diabetic, indicated to officers that she could not breathe because of the heat and requested to open her chuckhole. Staff refused to open the chuckhole.

33.     Ms. Borden's cell teemed with ants that crawled around the floor and on the walls. The showers smelled like mold and Ms. Borden frequently saw roaches throughout the women's units, including once on her food tray. The roaches were the largest she has ever seen, approximately two inches in size.

34.     Ms. Borden experienced migraines while detained, which she believes were caused by the mold. The migraines subsided after Ms. Borden was released.

35.     While Ms. Borden was detained, she observed many unsanitary conditions that were either addressed insufficiently or not addressed at all: a bed bug infestation in the women's unit; a woman who was left in her cell for four days while her toilet overflowed; a cell in which the toilet did not work at all and leaked into the cell below; and a cell that had black mold and ants.

36.     Workhouse officials also failed to meet Ms. Borden's and other women's basic sanitary needs. The facility would routinely run out of toilet paper, sanitary napkins, and other female hygiene products, requiring that female detainees go three or four days without these items.

37.     Five pregnant women who were housed in Ms. Borden's unit experienced complications with their pregnancies: one woman began leaking fluid late in her second trimester; another miscarried her child, which some detainees believed was due to the mold and inadequate medical services.

38.     Ms. Borden also suffered as a result of the lack of timely or adequate medical assessments and the Workhouse's insufficient delivery of medical services.

39.     Ms. Borden has suffered from asthma since childhood. She arrived at the Workhouse on May 15, 2017 and did not receive an inhaler for her asthma until July 13, 2017—nearly 60 days later. Ms. Borden recalls that she specifically requested an inhaler when she was first processed at the CJC.

40.     Additionally, during her detention, Ms. Borden experienced migraines, a skin rash, a sore in her nose, blurred vision, and an abscessed tooth. Ms. Borden did not have any of these conditions prior to arriving at the Workhouse. The abscessed tooth was eventually pulled after thirty days and she received an antibiotic; for the sore and rash, Ms. Borden was provided ointments. Ms. Borden also had a serious infection that was left untreated during her time in the Workhouse. She was not able to receive medical treatment for the infection until after her release.

41.     Beyond Ms. Borden's own difficulties, two women in her unit were bitten on the face by brown recluse spiders.

42.     Ms. Borden experienced severe overcrowding in the women's housing units. Space was in such short supply that women's units which had previously been used for solitary confinement were being used to house two women in each cell.

43.     Certain officers in Ms. Borden's unit would allow, and even encourage, fights without intervening. These officers would taunt the women into fighting and then decide who "won." Officers only sometimes pretended to stop the fights if a "white shirt" (a supervising officer) stopped by the unit.

44.     Officers would also make inappropriate sexual references to the bodies of the

female detainees. For example, one officer would regularly place herself behind a female detainee and make a thumbs-up depending on the shape of a female detainees' buttocks.

45.     Another male officer became well-known among female detainees for failing to follow protocol and refusing to announce that a male was on the floor. Instead, he walked the floor, usually when the women were in the showers or barely clad due to the heat, and observed the women in varying stages of undress while pretending that he was not watching.

46.     Ms. Borden was initially released from the Workhouse on bond on July 22, 2017. The charges against her were then dismissed on August 8, 2017. On October 24, 2017, approximately three months after Ms. Borden's release from the Workhouse and two and a half months after her charges were dismissed, Ms. Borden was pulled over and arrested on charges which had apparently been re-issued on August 11, 2017.

47.     Despite having made all required court appearances when the charges were initially filed, Ms. Borden faced a $10,000 cash-only bond that she could not pay.

48.     Ms. Borden narrowly avoided a return to the Workhouse when the court ordered that her bond be reduced to $500 cash, and that the court transfer the bond that had been posted in Ms. Borden's previous case.

49.     Ms. Borden's charges remain pending in the St. Louis City Circuit Court.

**<u>Vincent Grover</u>**

50.     Plaintiff Vincent Grover was detained in the Workhouse from May 17, 2017 to August 4, 2017 on a $1,500 bond that he could not pay. He was housed in the medical unit due to his history of seizures.

51.     Mr. Grover describes a medical unit that provides very little relief for detainees who are suffering from various maladies. There was no air-conditioning in the unit, and most

detainees, including Mr. Grover, slept with their mattresses on the floor due to the heat.

52.     Ice was distributed every thirty minutes, depending upon whether the officers chose to come back and retrieve the ice coolers. Some officers would not come back for hours, leaving the detainees with no ice until someone felt like returning.

53.     Mr. Grover observed detainees getting sick because of the heat and trying to find ways to deliberately get sent to "the hole," a separate, air-conditioned, section of the jail reserved for supposed troublemakers to be segregated from the general population. When the hole was at capacity, detainees were sent upstairs, which was considered much worse; upstairs, there was no air conditioning and the supervising officers were known to allow detainees to physically assault and rob each other.

54.     Mr. Grover's time in the Workhouse was marked by exposure to dehumanizing and unsanitary conditions. The toilets that were provided for him and others leaked from the bottom when they were flushed, and staff refused to clean the urine and feces that would leak onto the floor.

55.     Mr. Grover observed both rats and cockroaches throughout the facility on numerous occasions.

56.     According to Mr. Grover, there is "mold in the building like crazy." When the facility was set to have visitors, staff moved detainees from the upstairs dorms to the downstairs dorms to prevent visitors from seeing the upstairs dorms. He believes that this was done in part because the upstairs dorms have more, and more noticeable, black mold than the rest of the facility.

57.     While he could not see mold on the walls of the medical unit, the smell of mold was ever-present throughout the facility.

58.     Mr. Grover's observations and experiences reflect the City's lack of timely and/or adequate medical assessments and insufficient delivery of medical services.

59.     Despite Mr. Grover's pre-existing diagnosis and medical history of seizures at the time of his admission to the Workhouse on May 17, 2017, he did not receive his seizure medication until approximately July 20, 2017. Mr. Grover believes that he only began receiving his medication because he was complaining to his sister, who is a nurse at the CJC, and she complained to "the right people" to make sure he received his medication.

60.     During the time that he did not receive his prescribed medication, Mr. Grover felt light-headed and faint. These symptoms are typical when he does not take his seizure medication consistently. To mitigate these symptoms, he tried to remain quiet and still. However, the intense heat in the medical unit also seemed to exacerbate his symptoms.

61.     Mr. Grover and his fellow detainees experienced horrible mistreatment by staff, including arbitrary discipline, retaliation, and verbal abuse in the form of yelling and cursing.

62.     Several officers resorted to using mace on detainees merely because one or more detainees had said something that the officers did not like.

63.     Mr. Grover also observed officers arranging for detainees to attack each other on the officers' behalf. Such attacks were most commonly orchestrated against detainees who had made a complaint against one of the officers. When an officer sought to exact retaliation, she would recruit a detainee from one unit and place him in the same cell as the complaining detainee that she wished to punish. The recruited detainee would then violently attack the complaining detainee in exchange for payment via commissary or some other reward.

64.     Mr. Grover recalls a specific incident in approximately May 2017 in which an officer slammed a detainee on his head and left the detainee seriously injured. Shortly thereafter,

Mr. Grover stopped seeing the officer around the facility.

65.     When not arranging physical assaults, many of the officers were plainly apathetic to violence that broke out between detainees. On more than one occasion, he saw officers who witnessed a physical altercation unfolding in front of them and simply kept walking.

**John Doe**

66.     Plaintiff John Doe was detained in the Workhouse from June 29, 2017 to approximately July 31, 2017 on a $20,000 cash-only bond that he could not pay. On or about July 31, 2017, Mr. Doe was transferred to the CJC, where he remains at the time of filing.

67.     Mr. Doe has suffered from allergies for years, and generally takes several medications to mitigate the symptoms of his allergies. Although Mr. Doe requested medication for treatment of his allergies, he only received saline water and Claritin, and was told that he could only receive the latter for thirty days.

68.     In Mr. Doe's Workhouse dormitory of approximately 70 men, there were four ceiling fans in the corner of each room. When the temperatures reached 105 degrees outside in the month of July 2017, it felt more like 115 to 120 degrees inside of Mr. Doe's dorm. The extreme heat was so uncomfortable that Mr. Doe found himself sweating throughout the night and was unable to sleep.

69.     Officers would circulate periodically to each unit with a hand-held temperature gauge to read the temperature in each unit. When detainees requested to know the temperature in their unit, officers refused to provide them with that information.

70.     For a period of time during the heat wave, Mr. Doe and his fellow detainees only received water once per day. After the Workhouse began to receive media attention for the extreme temperatures inside of the facility, the distribution of water increased to twice per day.

71.     Workhouse staff distributed water by filling a cooler and shoving it into the middle of the dorm, prompting the detainees to compete with one another to get whatever water they could. Ice was distributed in the same manner, three times per day. Individuals who could reach the coolers quickly and without challenge received water and ice at least as often as it was distributed, while those who were older, sick, or subject to intimidation by other detainees often received nothing during these free-for-alls.

72.     Both detainees and officers suffered from the extreme heat. Mr. Doe often heard officers complain to detainees, as well as to each other, about the unbearable heat in the facility.

73.     Mr. Doe also witnessed several detainees deliberately breaking rules and manufacturing altercations in order to be sent to "the hole," one of the few air-conditioned spaces in the jail. This was only effective for a brief period before the hole became overpopulated.

74.     Mr. Doe met one 19-year-old fellow detainee with sickle-cell anemia who suffered health complications due to the extreme heat in the Workhouse. Mr. Doe witnessed this individual develop trouble breathing that required him to be transported to a local hospital. Mr. Doe does not know what transpired at the hospital or after, but he did not see the individual in the Workhouse again.

75.     Mr. Doe also knew an elderly man in his dorm who was suffering so severely in the heat that he told Mr. Doe and others that he was unsure he would survive. Mr. Doe and his fellow detainees were able to help the elderly man reach several family members who, collectively, were able to help him make his approximately $200 bond.

76.     Mice and cockroaches were a serious problem throughout Mr. Doe's time in the Workhouse. During mealtime in the dorms, mice and cockroaches could be found roaming around the dorm while the detainees ate.

77.     At one point, Workhouse staff responded to the mouse infestation by setting out glue traps. Mr. Doe does not believe that the glue traps were particularly effective at abating the mouse infestation, but he does recall a black snake being caught alive on one of the mouse traps that had been set out near the bunks in his dorm.

78.     Mr. Doe never saw extermination efforts underway in his dorm or elsewhere.

79.     Mr. Doe saw black mold all over the jail. He could also smell mold throughout the facility, and describes the smell, which worsened with the heat, as that of an old, wet basement.

80.     Mr. Doe learned that the kitchen had been closed because of black mold. He also spoke with detainees assigned to work in the kitchen about the significant amount of mold in the area used for food preparation.

81.     Mr. Doe also learned of a detainee who had been quarantined due to a positive tuberculosis test. After the detainee was quarantined in the hole for two months, Workhouse staff realized that the tuberculosis test was likely a false positive due to the high concentration of black mold on the second floor of the jail.

82.     Mr. Doe describes the toilet facilities in the Workhouse as "dysfunctional." When a detainee flushed one toilet, all of the human waste in that toilet would appear in the neighboring toilet instead of flushing properly.

83.     Beyond the egregious Workhouse conditions that he endured, Mr. Doe was deeply destressed by the culture of violence that he encountered inside of the Workhouse. Soon after his arrival at the jail, Mr. Doe learned that jail officers promoted violence among the detainees. The worst of this violence occurred in the upstairs dorm where "troublemakers" were sent for "gladiator season." Upstairs detainees were allowed to use their mattresses and brooms

as make-shift swords and other weapons and to engage in real fights with no intervention from the officers.

**John Roe**

84.    Plaintiff John Roe was detained in the Workhouse from July 3, 2017 to October 3, 2017 on a $3,000 bond that he could not pay.

85.    Like other male detainees, Mr. Roe was housed in a Workhouse dormitory with no air conditioning. As a result, in July 2017, Mr. Roe was forced to endure the extreme heat caused by external triple-digit temperatures.

86.    During this time, Workhouse officers brought ice into Mr. Roe's dormitory approximately every eight hours by shoving a cooler into the middle of the common room and telling the detainees to "fight for it." This not only prompted physical altercations, but it also left many detainees without any ice at all. Water was distributed in the same way. The only other source of water was a fountain in the unit, but the water from the fountain was hot.

87.    Mr. Roe suffered in the stifling heat day and night with no relief. Despite the City's public statements regarding its efforts to rotate all inmates through air-conditioned parts of the Workhouse[3], Mr. Roe insists that he was never given such an opportunity nor, to his knowledge, was anyone else in his dorm.

88.    Mr. Roe observed other detainees in his dorm who suffered serious health complications from the extreme heat in the facility. On or about July 21, 2017, a male detainee lost consciousness and had to be removed from the dorm. Another detainee with asthma had an

---

[3]*See* Durrie Bouscaren, "What's the workhouse? Here's what you need to know about St. Louis' Medium Security Institution," St. Louis Public Radio, http://news.stlpublicradio.org/post/what-s-workhouse-here-s-what-you-need-know-about-st-louis-medium-security-institution#stream/0.

attack and was temporarily unable to breathe. In response, Workhouse officials provided the detainee with an inhaler and returned him to the same stuffy, hot conditions in the dorm.

89.     During Mr. Roe's detention in the Workhouse, it was quite common for mice to run across his feet during the night and day. Cockroaches were also a frequent presence in his dorm.

90.     Sometime during the month of July, a correctional officer was bitten by a snake while walking through one of the catwalks that connects the dorms. This officer had to have her leg wrapped due to the lasting harm from the snake bite.

91.     Mr. Roe also observed mold everywhere throughout the facility that was "getting a lot of people sick." The mold was even in the showers as he tried to get clean, and he vividly recalls smelling the mold and feeling like he was inhaling it as he slept.

92.     Mr. Roe was just one of many detainees who complained to Workhouse officials about these deplorable living conditions, but he found that the staff did not care and did nothing to address the conditions. In Mr. Roe's words, "They look at us like dogs."

**Michael Mosley**

93.     Plaintiff Michael Mosley was detained in the Workhouse from June 4, 2017 through July 1, 2017 on a bond that he could not pay. While detained in the Workhouse, he was housed in the medical unit due to an issue with his knee.

94.     Even in the medical unit, there was nothing in place to mitigate the extreme heat conditions for detainees, with the exception of a handful of fans blowing hot air throughout the room.

95.     Ice was usually distributed in the medical unit twice per day. There were approximately 24 detainees in the medical unit at the time Mr. Mosley was detained, so typically

each person in the unit received ice. However, if the detainees requested ice instead of waiting for it to be distributed, the officers would claim to "lose" their ice bucket and wait several hours to bring any ice.

96.     The sight of rats and cockroaches was a daily occurrence while Mr. Mosley was detained at the Workhouse. The rats were commonly several inches long and would run around near his head while he lay in his bed at night.

97.     Mr. Mosley and other detainees went to great lengths to expel the rats from their living quarters. Mr. Mosley poured bleach throughout his space; one detainee tried covering the holes in his wall with paper; another tried putting peanut butter in a bag to catch the rats and then manually kill them.

98.     Roaches were equally or even more common in the Workhouse.  The officers in the Workhouse were told about the roaches but would just laugh about the problem and take no further action to resolve the issue.

99.     Mr. Mosley also experienced problems with the toilet facilities. When a toilet was flushed in one area, the contents of the toilet, including all manner of human excrement, would leak from the back or the front of the toilet onto the floor.

100.     Although Mr. Mosley did not visually observe mold in the medical unit, he recalls that the facility smelled like a basement. He was also somewhat concerned about possible lead exposure. He specifically recalls paint chipping off the wall and that some areas in the jail smelled like lead and iron.

101.     Mr. Mosley contracted athlete's foot while housed in the medical unit. He was assigned to the medical unit due to a patellar tear in his knee. Upon entry to the Workhouse, Mr. Mosley waited several hours before he saw a nurse. When he finally saw the nurse, she appeared

to have no idea what a patellar tear was nor how to treat it. He also reports he came in with a knee brace due to the tear in his knee but that a staff member eventually took this from him. As a result, Mr. Mosley was left with no way to mitigate the pain in his knee and subsequently only saw the nurse when she came around to pass out pills.

102.     Mr. Mosley experienced firsthand the retaliation that is commonplace by Workhouse guards. He recalls an incident in which a group of detainees was blamed for throwing crumpled paper balls at a lieutenant. In response, everyone on the unit was punished and put on a "lockdown." Mr. Mosley was aware of what exactly had transpired, and he spoke up to the guards about the unfairness of punishing all detainees for an incident that only involved a few people. When Mr. Mosley complained, an officer handcuffed him and threatened to put him in the hole. The handcuffs were so tight that they created permanent scabs on his wrists. Mr. Mosley eventually explained the situation to a supervisor who gave Mr. Mosley permission to return to his cell. Upon returning to his cell, Mr. Mosley discovered that his sleeping mat and commissary bucket had been removed, and all of his clothes had been taken. Mr. Mosley came to learn that this was one of the ways that some officers communicated to detainees that they should not "cross them."

**Diedre Wortham**

103.     Plaintiff Diedre Wortham was detained in the Workhouse from July 18, 2017 to August 9, 2017 on a $250 bond that she could not pay. While detained, Ms. Wortham was housed in multiple units in the women's dormitory.

104.     Upon being initially processed for detention, Ms. Wortham was held at the CJC prior to her transfer to the Workhouse. At the CJC, a nurse, after learning of Ms. Wortham's history of high blood pressure, took Ms. Wortham's blood pressure and realized that it was too

high for her to be processed into custody.

105.    Ms. Wortham was transported to a local hospital for medical treatment, including medication to stabilize her blood pressure.

106.    Once transferred to the Workhouse, Ms. Wortham's blood pressure, which had been stabilized at the hospital, became increasingly problematic. Despite Ms. Wortham's persistent requests for her prescribed medication, at least five days passed until the Workhouse staff provided her with the medication.

107.    Ms. Wortham describes her Workhouse cell as "gross" and recalls that it "wasn't clean," with old food and mold on the walls.

108.    In order to make the conditions in her cell more sanitary, Ms. Wortham managed to sneak various cleaning solutions from the dorm and used her own clothing items and a jail-issued towel to scrub the walls and floors.

109.    While this improved the cleanliness of her cell, mold still remained in the room, making it very difficult for Ms. Wortham to breathe, especially during the night when the cell doors were closed. Ms. Wortham would often pull her shirt over her nose in order to avoid breathing in the mold in her room.

110.    Beyond the visible mold, Ms. Wortham saw old toilet paper packed into the air vents that had turned color and grown hard and moldy over time. The Workhouse staff made no efforts to clean the cells or the vents prior to her or any other detainees being moved in.

111.    The smell of mold was so bad in her cell that Ms. Wortham made a handwritten complaint and submitted it to the "sick box," a box where detainees were told to submit grievances of a medical nature. There was no response to her complaint and the mold remained in her cell.

112.     Although the women's dorms were somewhat cooler than the men's dorms due to the presence of air-conditioning units, the women's dorms were still often quite warm with poor air circulation. Sometimes, this was due to the toilet paper blocking the air vents; other times, it was due to the air-conditioning units malfunctioning.

113.     The women's dorms also had insect and rodent infestations. Ms. Wortham recalls that stories of women discovering rodents in their cells and elsewhere were almost constant. Ms. Wortham encountered gnats and roaches in her cell on a daily basis.

114.     There was a noticeable lack of concern for the detainees' hygiene in the women's dorms. Workhouse staff only issued the women two pair of underwear upon their entry into the jail, and laundry was done only once per week. There were multiple times that Ms. Wortham's and other female detainees' laundry would not be picked up for several weeks at a time, leaving them to wear the same undergarments repeatedly during that period.

115.     On one occasion in July 2017, Workhouse Superintendent Jeffrey Carson visited and Ms. Wortham told him about the mold and gnats. Superintendent Carson told her that he was "on top of it" and that the building was being exterminated. She recalls no changes in the conditions of the facility following this conversation.

## II.     WORKHOUSE POPULATION

116.     In March 2017, the St. Louis Department of Public Safety's Division of Corrections began releasing Monthly Reports with information regarding the City's detained population and related services.[4]

117.     These reports reveal the following Workhouse population totals: 770 detainees for

---

[4] Department of Public Safety St. Louis City Division of Corrections, "Monthly Reports 2017," https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/monthly-reports-2017.cfm.

June 2017; 741 detainees for July 2017; 696 detainees for August 2017; and 632 detainees for September 2017.[5]

118.    Among those in Division of Corrections custody, only 14 detainees were serving post-conviction sentences in June 2017; 10 post-conviction detainees in July 2017; 11 post-conviction detainees in August 2017; and 9 post-conviction detainees in September 2017. The reports characterize all others as pretrial detainees.

119.    While there is no demographic breakdown provided for the Workhouse specifically, the following chart reflects the demographic makeup of the detained population for the Workhouse and the Criminal Justice Center ("CJC") combined, according to the Monthly Reports:

|  | Black Males | White Males | Black Females | White Females |
|---|---|---|---|---|
| **June** | 79% | 13% | 5% | 3% |
| **July** | 79% | 14% | 5% | 3% |
| **August** | 80% | 12% | 5% | 3% |
| **September** | 80% | 12% | 4% | 3% |

120.    The reports also reflect that a significant number of detainees in the City's custody suffer from mental health issues. Per the reports, in June 2017, there were 272 detainees prescribed anti-psychotic medications, mood stabilizers, or anti-anxiety medications, and 356 detainees on suicide watch; in July 2017, these numbers were 97 and 349 detainees, respectively; in August 2017, 144 and 378 detainees, respectively; in September 2017, 139 and 202 detainees,

---

[5] At the time of filing, September 2017 is the most recent report available.

respectively.[6]

### III.      HISTORICAL BACKGROUND

#### The *Tyler* Litigation

121.    The Workhouse was originally constructed in 1966.

122.    It became one of the primary detention facilities for the City of St. Louis when the

City began transferring detainees from the old St. Louis City Jail to reduce overcrowding in

response to the 1974 class-action lawsuit *Tyler v. Percich*.[7]

123.    In a 1974 Memorandum Opinion regarding the City Jail litigation, this Court

made factual findings regarding jail conditions which violated the Eighth and Fourteenth

Amendment rights of detainees, including the following:

    a.  Detainees with mental illnesses housed with general population;
    b.  Structural inadequacies within the facility;
    c.  Frequently inoperative toilets;
    d.  Inadequate ventilation;
    e.  Inadequate lighting;
    f.  Infestations of mice and insects;
    g.  Confinement of detainees for 24 hours per day with no recreation;
    h.  Disciplinary action for detainees without any notice of jail rules or procedures;
    i.  Denial of access to medical care or regular physical examinations;
    j.  Lack of psychiatric evaluation or mental health services;
    k.  Lack of dental treatment;
    l.  Overcrowding; and
    m.  Violence, brutality, and general fear among detainees for their safety.[8]

These conditions bear startling resemblance to those reported by Workhouse detainees today.

124.    Several years into the *Tyler* case, in response to contempt motions by the

plaintiffs regarding the City's noncompliance with the court's 1974 order, the court concluded

---

[6] Monthly Reports provide no explanation for why the number of detainees placed on suicide watch consistently and significantly exceeds the number of detainees receiving pharmaceutical mental health treatment.

[7] No. 74-40-C (E.D. Mo. Jan. 18, 1974).

[8] *Tyler v. Percich*, Memorandum Opinion, No. 74-40-C (E.D. Mo. Oct. 15, 1974).

that because "members of the plaintiff class were regularly and repeatedly being housed in other facilities, such as . . . the Medium Security Institution known as the City Workhouse," the Workhouse would be considered a "mere extension[] of the City Jail." As such, it was "required to conform and adhere to the constitutionally required standards of population, sanitation, health services, and other housing standards mandated by the Court for the City Jail."[9]

125.    Now subject to the jurisdiction of the court, the Workhouse was ordered to limit its population to 450 detainees.[10]

126.    The *Tyler* litigation and resulting federal court oversight remained active for years due to persistent overcrowding and other systemic issues noted by the court.

127.    On April 11, 1990, Eastern District Judge Clyde Cahill rendered an opinion criticizing the St. Louis City jail system and those complicit in its failings. In his opinion, Judge Cahill discussed the collective contributions of the St. Louis Circuit Attorney's Office, local law enforcement's concentration in and around poor and minority neighborhoods, and the ever-present "War on Drugs" to the problems of overcrowding and deteriorating conditions in St. Louis's jails, including the Workhouse:

> Certain neighborhoods in St. Louis have become the target of intensive police activity. . . . These intrusive tactics, coupled with detention because of poverty, lead to a destruction of confidence in the criminal justice system. Prisons and punishment *alone* cannot be the answer—there must be encouragement, assistance and above all, confidence in the fairness of the legal system. Mass detention for petty offenses now may give temporary relief but it only postpones the misery to come.[11]

128.    Judge Cahill noted the City courts' and prosecutors' frequent refusals to give low bonds or recognizance bonds to petty offenders and drug offenders, thereby using imprisonment as the default and contributing to the problem of overcrowding in the City jails:

---

[9] *Tyler v. United States*, 602 F.Supp. 476, 477 (E.D. Mo. 1984).
[10] *Id.* at 478.
[11] *Tyler v. United States,* 737 F.Supp. 531, 536 (E.D. Mo. 1990) (emphasis in original).

Most of the persons now arrested for these drug-related offenses are young black men from North St. Louis. Their prospects are as bleak as their surroundings. . . . While the racial connotations of this issue are seldom mentioned, they may, nonetheless, be a factor in the public's perception of the drug problem. There are myths, which have been partially developed by the media, that only minorities are involved with drugs. The City's prison population, nearly all black, perpetuates this misconception. The Court does not believe that racial identity is used as a factor in these matters; but nonetheless, because most blacks who are arrested are poor, they are more likely to be detained when denied recognizance.[12]

129.     As alternatives to the City's execution of the War on Drugs and systematic incarceration, particularly of black men in the St. Louis region, the Court suggested the following alternatives:

    a.  Increase of public defenders and staff;
    b.  Increased use of recognizance bonds;
    c.  Utilization of various forms of house arrest;
    d.  Elimination of detention for military arrestees, parole violators and persons convicted but awaiting other trials; and
    e.  Fuller utilization of judicial resources to substantially reduce the time detainees spend awaiting trial.[13]

130.     Litigation and court oversight would continue for nearly another decade as the court pushed the City to resolve its overcrowding issues and to find alternative placement for parole and probation violators.[14]

131.     In 1996, the City proposed plans to build a brand-new facility (now the CJC) and to complete an extension to the existing Workhouse site that would allow a capacity of 1,222 beds, which would increase the City's overall capacity for inmates and pretrial detainees.[15]

132.     On April 6, 2000, all parties consented to dismissal of the *Tyler* case based on the closure of the City Jail and the City's representations that the past conditions at the Workhouse

---

[12] *Id*. at 538.
[13] *Id.* at 539.
[14] *See Tyler v. United States*, Order, No. 74-40-C (E.D. Mo. Sept. 18, 1994) (Court orders release of all probation violators due to overcrowding); Order, No. 74-40-C (E.D. Mo. Sept. 16, 1996) (Court ordered cap of no more than 20 probation violators in City jail); *Tyler v. Murphy*, 135 F. 3d 594 (8th Cir. 1998) (Eighth Circuit reversed District Court's probation violator cap).
[15] *See Tyler v. United States*, No. 74-40-C (E.D. Mo. Aug. 1, 1994).

had been remedied.[16]

133.    Unfortunately, the City has never fully heeded Judge Cahill's prescient warnings, and has instead continued to incarcerate residents—most of them young black men and pretrial detainees—at alarming rates, with conditions in the Workhouse continuing to deteriorate over time.

### ACLU Report on Poor Conditions and Abuses Inside the Workhouse

134.    In 2007, the Eastern Missouri branch of the American Civil Liberties Union ("ACLU") investigated conditions within the St. Louis Correctional system, including the Workhouse.[17]

135.    During this investigation, six correctional officers spoke to the ACLU on the condition of anonymity due to fear of retaliation and intimidation from their superiors. Five of these officers provided specific examples about incidents that occurred in the Workhouse, and three detainees provided examples about their own experiences in the Workhouse.

136.    In 2009, the ACLU concluded its investigation and released a scathing report detailing the rampant abuses, policy violations, overcrowding, negligence, staff assaults on detainees, systematic cover-up of incidents by staff and higher-ups, and squalid conditions inside of the Workhouse.

137.    Some specific facts revealed in the interviews of correctional officers and others within the Workhouse include the following:

    a.  **Overcrowding:** Overcrowding is so severe that detainees are regularly forced to sleep under beds and toilets.

---

[16] *See Tyler v. United States*, No. 74-40-C (E.D. Mo. April 6, 2000).
[17] Redditt Hudson, *Suffering in Silence: Human Rights Abuses in St. Louis Correctional Centers, a Preliminary Investigation of Civil Liberties Violations at the St. Louis Justice Center and the Medium Security Institution*, American Civil Liberties Union of Eastern Missouri, 2009.

b. **Unsanitary Conditions:** Mats and beds were not regularly sanitized. Vomit and fecal matter could sometimes be found on surface areas where inmates were housed. Outbreaks of staph infections were a regular and ongoing problem.[18] Two correctional officers reported these conditions.[19]

c. **False Reports**: There were multiple incidents of correctional officers receiving directions from superiors to write false reports of incidents or being directed not to write reports of incidents that occurred.[20]

d. **Officers Assaulting Detainees**: There were eye witness accounts of a captain's brutal assault of a young female detainee that lasted for several weeks. The detainee would cry and plead for the beatings to stop but the captain would continue to savagely beat her. This was followed by multiple assaults and beatings that this correctional officer witnessed by this captain and other officers who were allowed into detainees' cells for the express purpose of assaulting them.[21]

There were also reports of at least two separate assaults by two lieutenants, one of which involved a suicidal detainee. In order to cover-up this lieutenant's assault of a detainee, additional charges were filed against the detainee claiming that he assaulted the officer.[22]

e. **Culture of Cover-Up**: A culture of abuse and cover-up was encouraged with promotions, favors and a "heads up" to officers by administrators when random drug tests were to occur.[23] Lesser ranking officers were shielded from discipline for any of the actions described herein by superiors, including the superintendents. Correctional officers who were insistent upon policy adherence often found themselves facing retaliation and/or eventual termination.[24]

f. **Medical inattention**: Nurses were slow to provide care and generally inattentive to sick or injured detainees. For example, a detainee who was having a seizure was told to "sleep it off."

Detainees who were elderly or sick and therefore limited in their mobility were told by jail staff that they could not receive the medication prescribed to them because they "didn't make it" in time.

A detainee who struck his head in the shower and attempted to obtain medical

---

[18]  *Id.* at 5.
[19] *Id.* at 14, 15.
[20] *Id.* at 6.
[21] *Id.* at 11, 12.
[22] *Id.* at 15.
[23] *Id.* at 10.
[24] *Id.* at. 19, 20.

treatment was not given adequate medical treatment and lost his hearing completely.[25]

A detainee who continually vomited was simply placed in a cell by himself instead of given medical attention. He continued to vomit repeatedly and no one checked on him. When staff finally checked on him, rigor mortis had already set in. He was 29 years old. [26]

138. Between 2012 and 2016, multiple detainees have died inside of the Workhouse.

    a. Willie Woodberry, age 62, was found unresponsive in his cell in May 2012. Mr. Woodberry was being held on drug charges.[27]

    b. Ronald Pulliam Jr, age 38, was found dead in his cell in August 2012. Mr. Pulliam was a pretrial detainee awaiting trial.[28]

    c. Amy Polluck, age 34, hanged herself in her cell in September 2016. Staff at the Workhouse knew Ms. Polluck had mental health issues, yet no additional security precautions were in place. [29]

## IV.    GENERAL ALLEGATIONS

**Insufficient Ventilation and Extreme Heat**

139. The City has subjected and continues to subject all people confined in the Workhouse, including Plaintiffs and class members, to a substantial risk of harm, injury, or death by failing to provide adequate ventilation and by failing to employ sufficient devices and mechanisms to mitigate the extreme heat.[30]

---

[25] *Id.* at 13, 14.
[26] *Id.* at 18.
[27] Maria Keena, "Inmate Dies at St. Louis City Jail," CBS St. Louis, May 26, 2012, http://stlouis.cbslocal.com/2012/05/26/inmate-dies-at-st-louis-city-jail/.
[28] "Inmate Found Dead in St. Louis Jail Cell," St. Louis Post-Dispatch, August 29, 2012, http://www.stltoday.com/news/local/crime-and-courts/inmate-found-dead-in-st-louis-jail-cell/article_16620dde-f1ee-11e1-ba7b-001a4bcf6878.html.
[29] Kim Bell, "Woman Charged with assault at Ballpark Village hangs herself in St. Louis jail," St. Louis Post-Dispatch, September 7, 2016, http://www.stltoday.com/news/local/crime-and-courts/woman-charged-with-assault-at-ballpark-village-hangs-herself-in/article_582b8abf-0322-5187-a895-9040977d7f48.html.
[30] In July, the City installed temporary air conditioning units at the Workhouse pursuant to a one-month contract. Kayla Gaffney, "City installs air conditioning units for Workhouse," KMOV,

140.     During the month of July 2017 in the City of St. Louis, the average temperature was 94.3 degrees Fahrenheit. For two weeks in July 2017, the average temperature was 101 degrees Fahrenheit.[31]

141.     During the same period, temperatures *inside* the Workhouse reached triple digits, soaring as high as 125 degrees Fahrenheit, and rarely falling below 90 degrees Fahrenheit. *See* Exhibit A, Daily Temperature Reports July 20-22, 2017.

142.     The Workhouse confines approximately 70 men at a time in brick-walled, concrete-floored dormitories that lack air conditioning.

143.     Some of the dormitories do not even have windows. The windows in these dorms are completely boarded up with wood or some type of cork material, making the heat in these spaces even more intolerable.

144.     For those dormitories with windows, there are no screens to provide protection from the outside elements. As a result, mosquitoes, birds, and squirrels are a regular presence in the dormitories.

145.     Multiple detainees report that the only housing unit that receives water with any regularity during the extreme heat has been the infirmary, which also lacks air conditioning. Otherwise, water and ice distribution during extreme heat periods varies and, at times, becomes a source of conflict and violence between detainees.

146.     When the Workhouse officials determine that ice is needed, officers simply push a cooler of ice into the middle of a dorm forcing detainees to scramble for the cooler and

July 24, 2017, http://www.kmov.com/story/35944096/city-orders-air-conditioning-units-for-st-louis-jail. However, despite the annual occurrence of summer in St. Louis and the corresponding heat, the City has neither proposed nor implemented any permanent solution to this problem.
[31] Observed highs for July 2017 in St. Louis, Missouri. *Monthly Climate Data*, available at https://www.weather.gov/lsx/monthTab.

compete for ice that is gone within minutes. Predictably, this often results in physical fights and detainees who are injured, upset, and still without the benefit of the ice.

147.    Unlike the men's dormitories, the women's dormitories are one of the few air-conditioned portions of the Workhouse.

148.    In addition to detainees, Workhouse officers also report that the summertime heat creates intolerable work conditions.

149.    The City has willfully refused and failed to take reasonable measures to deal with the continued heat in the dormitories and the health-related risks associated with the extreme heat. The City and its officials have continued to show deliberate indifference to the health and of the Plaintiffs and class members by failing to enact intervening policies that would prevent the continued heat-related health issues.

150.    Many detainees have suffered health complications from the extreme heat in the facility, including dehydration, heat exhaustion, asthma attacks, and heat rashes.

**Unsanitary and Unhealthy Conditions: Rodent and Insect Infestation, Overflowing Sewage, and Black Mold**

151.    The City has subjected and continues to subject all people confined in the Workhouse, including Plaintiffs and class members, to a substantial risk of harm, injury, or death by failing to employ sufficient remediation measures to eradicate inhumane and unsanitary conditions in the Workhouse.

152.    Workhouse detainees and staff report that mold is a constant presence in the facility, including throughout the living quarters. A significant portion of the mold is black in color. Despite the fact that detainees have registered many complaints about the mold, the City has undertaken no serious efforts to remediate this dangerous condition.

153.    Toilets, sinks, and showers in the dormitory are filthy and regularly experience

plumbing problems. The toilets and sinks often overflow, forcing detainees to navigate urine and feces in order to use the restroom facilities. This experience, and the resulting stench, is even worse in the extreme heat that detainees suffer during the summertime.

154.    Rodents and insects are a feature of life in the Workhouse. Almost universally, Plaintiffs and others detained in the Workhouse report rats, mice, spiders, cockroaches, and other insects in nearly every part of the facility. Some detainees even report finding snakes in the living quarters.

155.    Cleaning supplies are issued and utilized sparingly. With 60-70 detainees in each male dormitory, the detainees find it impossible to keep up with proper cleaning of the facilities themselves using the tools that they are provided. Workhouse staff do not assist with cleaning the living areas to keep them sanitary.

156.    Describing the ubiquity of cockroaches in the facility, one detainee simply said, "If someone told me to go back there and find a roach in order to be free, I'd have been a free man the first day I was in here."

157.    Many St. Louis City officials, including Mayor Lyda Krewson and President of the Board of Aldermen Lewis Reed, have visited the Workhouse in recent months and observed many of the deplorable conditions in the Workhouse. Still, detainees continue to suffer in these conditions every day, with no indication of significant remediation.

**Inadequate Medical Care**

158.    The City has subjected and continues to subject all people confined in the Workhouse, including Plaintiffs and class members, to a substantial risk of harm, injury, or death by failing to provide adequate medical care and by failing to implement adequate mechanisms to ensure a sufficient medical care delivery system.

159.    The City does not conduct timely or adequate medical assessments of individuals entering the Workhouse, nor do Defendants process timely medical complaints from individuals seeking medical care.

160.    Workhouse staff are selective and arbitrary in determining those medical conditions that warrant medical evaluation and treatment and those that do not. As a result, many detainees who report that they are in need of medical attention are simply ignored or told to stop complaining. In some cases, this results in the exacerbation of serious medical conditions.

161.    This general indifference to requests for medical care extends to mental health treatment, which is in severe shortage in the Workhouse relative to the significant need.

**Overcrowding, Inadequate Staffing, Violence, and Retaliation from Workhouse Staff**

162.    The City's failure to implement mechanisms to accommodate for the appropriate number of detainees, along with its failure to provide an adequate number of officers to supervise detainees, has subjected and continues to subject all people confined in the Workhouse, including Plaintiffs and class members, to a substantial risk of harm, injury, or death.

163.    The City's lack of oversight and lack of training and supervision of its correctional officers has created an environment that promotes violence and retaliation. Sometimes this violence is perpetrated by the Workhouse officers themselves; other times, the staff merely allow violence between the detainees as a way of "teaching a lesson."

164.    Many detainees describe Workhouse officers as moody and vindictive. Actions as minor as requesting a medical form can result in a detainee being the recipient of anger, screaming, and cursing by jail staff.

165.    Despite public representations by the City regarding a law library, multiple detainees report that no such law library exists in the Workhouse. When detainees request access

to the law library, they are told by staff that there is not one.

## V.     CLASS ALLEGATIONS

166.    This action is brought and may be properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

167.    Plaintiffs bring these claims on behalf of themselves and on behalf of all persons who are, were, or will be detained in the Workhouse. A class action is a superior means, and the only practicable means, by which Plaintiffs and class members may challenge the City's allowance and maintenance of unconstitutional conditions in the Workhouse.

168.    Plaintiffs represent a class of persons ("Injunctive Class") seeking injunctive and declaratory relief and defined as follows:

> **Injunctive Class**: **All persons who are, have been, or will in the future become detainees in the Workhouse.**

169.    Certification of the Injunctive Class under Federal Rule of Civil Procedure 23(b)(2) is appropriate because the Defendant City, through the policies, practices, and procedures that govern the conditions and patterns of conduct in the Workhouse, has acted and refused to act on grounds generally applicable to the Injunctive Class. Injunctive relief compelling the City to comply with constitutional requirements will protect both those individuals currently detained in the Workhouse and those individuals, including Plaintiffs, subject to detention in the Workhouse in the future should past charges be re-filed, new charges filed, probation or parole revoked, and conditions of release imposed that Plaintiffs and class members cannot satisfy.

170.    Plaintiffs also represent classes of persons ("Damages Classes") seeking damages for harms incurred as a result of the conditions described herein and defined as follows:

> **Damages Class 1**: All persons who are or were pretrial detainees in the Workhouse, and who were or will be released from the Workhouse on or after November 13, 2012.
>
> > **Damages Subclass 1**: All persons who are members of Damages Class 1 who were assigned to a dorm, pod or other area at the Workhouse in which the internal temperature equaled or exceeded 88 degrees Fahrenheit.
>
> **Damages Class 2**: All persons who are or were post-conviction detainees in the Workhouse, and who were or will be released from the Workhouse on or after November 13, 2012.
>
> > **Damages Subclass 2**: All persons who are members of Damages Class 2 who were assigned to a dorm, pod or other area at the Workhouse in which the internal temperature equaled or exceeded 88 degrees Fahrenheit.

171.    Plaintiffs Borden, Grover, Doe, Roe, Mosley, and Wortham are all typical members of Damages Class 1 and Damages Subclass 1.

172.    Plaintiff Cody is a typical member of Damages Class 2 and Damages Subclass 2.

173.    Certification of the Damages Classes and subclasses under Federal Rule of Civil Procedure 23(b)(3) is appropriate in that the Plaintiffs and class members seek monetary damages, common questions predominate over any individual questions, and a class action is superior for the fair and efficient adjudication of this controversy.

174.    **Numerosity/Impracticability of Joinder:** Class members are so numerous that joinder of all members would be impracticable. The Workhouse has a stated capacity of over 1,100 detainees. [32] Between the months of June and September of 2017, the Workhouse averaged a population of 710 detainees.[33] Upon information and belief, the classes consist of thousands of individuals. The precise number of class members can be readily ascertained and identifying information for class members is, upon information and belief, within the Defendant City's

---

[32] *Id.*
[33] *See supra* note 2.

possession or control.

175. **Commonality and Predominance:** There are questions of law and fact common to all class members that predominate over any questions affecting only individual class members, including but not limited to the following:

a. Whether the unsafe and unsanitary conditions at the Workhouse described in this Complaint violate the Eighth and Fourteenth Amendments to the United States Constitution.

b. Whether the policy or practice of retaliation against detainees by Workhouse staff as described in the Complaint violate the First Amendment to the United States Constitution.

c. Whether the City's policies and practices subject detainees to a substantial risk of harm from unsanitary conditions, and therefore constitute a violation of Plaintiff and Class members' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

d. Whether the City's acts and/or omissions in the failure to provide safe and sanitary conditions for detainees reflect deliberate indifference to the health and safety of detainees and inmates, and therefore constitute a violation of the Eighth and Fourteenth Amendments to the United States Constitution.

e. For the Injunctive Class, what type of injunctive relief is appropriate and necessary to ensure that the conditions of the Workhouse comply with constitutional standards.

f. For the Damages Classes, what damages should be awarded to redress and compensate for the harms suffered by class members as a result of the conditions and conduct created by the unconstitutional policies and practices of the Defendant City.

176. **Typicality:** The named Plaintiffs' claims are typical of the claims of class members, and they have the same interests as all other class members that they represent. Each of them suffered injuries from the failure of the City to comply with basic constitutional protections. The named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of class members and are based on the same legal theories. The

answer to whether the conditions and conduct in the Workhouse reflect unconstitutional policies

and practices will determine the claims of the named Plaintiffs and every other class member.

177.    **Adequacy:** the named Plaintiffs are adequate representatives of the classes

because their interests do not conflict with the interests of the class members they seek to

represent; they have retained counsel competent and experienced in civil rights litigation and

complex class action litigation; and the Plaintiffs intend to prosecute this action vigorously. The

interests of class members will be fairly and adequately protected by the Plaintiffs and Plaintiffs'

counsel.

## CLAIMS FOR RELIEF

### COUNT I
**Fourteenth Amendment, 42 U.S.C. § 1983 – Cruel and Unusual Conditions**

178.    Plaintiffs incorporate by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

179.    By the policies and practices described herein, the Defendant City has subjected

and continues to subject Plaintiffs Jasmine Borden, Vincent Grover, John Doe, John Roe,

Michael Mosley, and Diedre Wortham and pretrial class members to a substantial risk of serious

harm and injury from such inhumane conditions as poor ventilation and extreme heat, insect and

rodent infestations, overflowing sewage, black mold, inadequate medical care, overcrowding and

understaffing, violence between detainees, and retaliation by Workhouse staff, and has violated

their right to basic human dignity and to be free from cruel and unusual pretrial detention

conditions under the Fourteenth Amendment to the United States Constitution. These policies

and practices have been and continue to be implemented by the City and its agents, officials,

employees, and all persons acting in concert under color of state law, in their official capacity,

and are the proximate cause of the Plaintiffs' and class's ongoing deprivation of rights secured

under the Fourteenth Amendment.

180.     The Defendant City has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conditions and conduct. It should be obvious to the City and to any reasonable person that the conditions imposed on Plaintiffs and class members for many months or years at a time cause tremendous mental anguish, physical harm, pain, and suffering to such individuals. Moreover, the City has repeatedly been made aware, through administrative grievances, written complaints, media accounts, and other public reports, that class members have experienced and continue to experience, or are at risk of, significant and lasting injury.

**COUNT II**
**Eighth Amendment, 42 U.S.C. § 1983 – Cruel and Unusual Punishment**

181.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

182.     By the policies and practices described herein, the Defendant City has subjected and continues to subject Plaintiff James Cody and post-conviction class members to a substantial risk of serious harm and injury from such inhumane conditions as poor ventilation and extreme heat, insect and rodent infestations, overflowing sewage, black mold, inadequate medical care, overcrowding and understaffing, violence between detainees, and retaliation by Workhouse staff, and has violated their right to basic human dignity and to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution. These policies and practices have been and continue to be implemented by the City and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and class's ongoing deprivation of rights secured under the Eighth Amendment.

36 of 43

183.     The Defendant City has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conditions and conduct. It should be obvious to the City and to any reasonable person that the conditions imposed on Plaintiffs and class members for many months or years at a time cause tremendous mental anguish, physical harm, pain, and suffering to such individuals. Moreover, the City has repeatedly been made aware, through administrative grievances, written complaints, media accounts, and other public reports, that class members have experienced and continue to experience, or are at risk of, significant and lasting injury.

### COUNT III
### First Amendment, 42 U.S.C. § 1983 – Unlawful Retaliation

184.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

185.     Critical to preservation of the Eighth and Fourteenth Amendment rights of detainees to be free from cruel and unusual conditions is the ability to lodge complaints and grievances regarding jail conditions, including the conduct of jail staff, an ability protected by the First Amendment to the United States Constitution. By its policies and practices, the Defendant City has subjected and continues to subject those Plaintiffs and class members who lodge valid complaints to unlawful retaliation in violation of the First Amendment. This unlawful retaliation includes, but is not limited to: punishing complaining detainees to "the hole"; committing or arranging for other detainees to commit acts of violence against complaining detainees; or otherwise denying certain allowances and privileges to complaining detainees. The City's policy and practice of unlawful retaliation against Workhouse detainees has been and continues to be implemented by the City and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause

of the Plaintiffs' and class's ongoing deprivation of rights secured under the First Amendment.

186.    The Defendant City has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such unconstitutional conduct. It should be obvious to the City and to any reasonable person that the retaliatory conduct of the City and its agents causes tremendous mental anguish, physical harm, pain, and suffering to such individuals. Moreover, the City has repeatedly been made aware, through administrative grievances, written complaints, media accounts, and other public reports, that class members have experienced and continue to experience, or are at risk of, significant and lasting injury.

### COUNT IV
### 42 U.S.C. § 1983 – Failure to Supervise and Train

187.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

188.    It is and has been the Defendant City's policy, practice, and custom to inadequately instruct, train, and supervise its correctional officers and other Workhouse employees and officials with respect to maintaining sanitary and habitable conditions in detainees' living quarters; avoiding contact with human waste and sewage; preventing or responding to violence between detainees; or otherwise repairing or remedying dangerous or repugnant conditions at the Workhouse. The City, as a policy and practice, likewise failed to instruct, train, or supervise its correctional officers with respect to responding to detainee complaints in an appropriate and non-retaliatory manner. To the contrary, the City has instead ratified the treatment of Workhouse detainees by failing to remedy unconstitutional conditions or punish staff for misconduct.

189.    In its failures, the Defendant City has been deliberately indifferent to the rights of Workhouse detainees, and these failures are the direct and proximate cause of the violations of

Plaintiffs' and class members' rights as alleged herein, as well as damages including mental

anguish, physical harm, pain, and suffering.

<u>COUNT V</u>
**Fourteenth Amendment, 42 U.S.C. § 1983 – Cruel and Unusual Conditions Due to Heat Exposure**

190.    Plaintiffs incorporate by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

191.    Defendant City's policies and practices described herein have subjected or

continue to subject class members including Plaintiffs Borden, Grover, Doe, Roe, Mosley, and

Wortham to a substantial risk of serious harm of exposure to unconstitutionally high apparent

temperatures[34] inside the housing areas at the Workhouse.

192.    Defendant City's actions in promulgating these policies and practices described

herein unnecessarily and wantonly cause the Plaintiffs and class members pain. Such inhumane

heat conditions have violated their right to basic human dignity and to be free from cruel and

unusual pretrial detention conditions under the Fourteenth Amendment to the United States

Constitution.

193.    These policies and practices have been and continue to be implemented by the

City and its agents, officials, employees, and all persons acting in concert under color of state

law, in their official capacity.

194.    These policies and practices are the proximate cause of past and ongoing

deprivation of the rights of Plaintiffs and Damages Subclass 1 secured under the Fourteenth

---

[34] *See Cole v. Collier*, No. 4:14-cv-1698, 2017 U.S. Dist. LEXIS 112095, *1 (S.D. Tex. July 19, 2017). In *Cole v. Collier*, the Fifth Circuit adopted an expert's determination that 88 degrees Fahrenheit was the threshold above which the risk of heat-related illness increased, and while prolonged exposure to a heat index above 88 degrees significantly increases the risk of heat-related illness for even young and healthy individuals, those with heat sensitivities may suffer heat-related illnesses within a few hours. *Id.* at *58, 128.

Amendment.

195.    Defendant City is aware that extreme heat in the Workhouse poses a substantial risk of serious injury to detainees, including Plaintiffs and the Damages Subclass 1. Defendants' knowledge is demonstrated by City policies and practices and publicly-accessible documentation of unconstitutionally high temperatures.

196.    The Defendant City has condoned or been deliberately indifferent to such conditions and conduct. It should be obvious to the City and to any reasonable person that the heat that Defendant City chooses to expose detainees to for many months at a time causes tremendous physical harm, mental anguish, pain, and suffering to such individuals. Moreover, the City has repeatedly been made aware through administrative grievances, written complaints, media accounts, and other public reports that Plaintiffs Borden, Grover, Doe, Roe, Mosley, and Wortham and members of Damages Subclass 1 have experienced and continue to experience, or are at risk of significant and lasting injury.

<u>COUNT VI</u>
**Eighth Amendment, 42 U.S.C. § 1983 – Cruel and Unusual Punishment Due to Heat Conditions**

197.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

198.    Defendant City's policies and practices described herein have subjected or continue to subject members of Damages Subclass 2, including Plaintiff James Cody, to a substantial risk of serious harm and injury from exposure to such extreme, unconstitutionally high apparent temperatures[35] inside the housing areas at the Workhouse.

199.    Defendant City's actions in promulgating these policies and practices described herein unnecessarily and wantonly cause Plaintiff Cody and members of Damages Subclass 2

---

[35] *See Cole v. Collier*, 2017 U.S. Dist. LEXIS 112095, at *58, 128.

pain. Such inhumane heat conditions have violated their right to basic human dignity and to be free from cruel and unusual pretrial detention conditions under the Eighth Amendment to the United States Constitution.

200.    These policies and practices have been and continue to be implemented by the City and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity.

201.    These policies and practices are the proximate cause of past and ongoing deprivation of the rights of Plaintiffs and Damages Subclass 2 secured under the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

202.    Defendant City has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conditions and conduct. It should be obvious to the City and to any reasonable person that the heat conditions imposed on Plaintiff Cody and members of Damages Subclass 2 for many months at a time cause tremendous mental anguish, physical harm, pain, and suffering to such individuals. Moreover, the City has repeatedly been made aware through administrative grievances, written complaints, media accounts, and other public reports that Plaintiff Cody and the members of Damages Subclass 2 have experienced and continue to experience, or are at risk of significant and lasting injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all class members, respectfully request that this Court:

a.      Issue an order certifying this suit as a class action;

b.      Enter judgment in favor of Plaintiffs and class members and against the Defendant City;

c.      Enter a declaratory judgment that declares:

    i.      Defendant's conduct has violated Plaintiffs' and class members' Fourteenth Amendment rights to safe, sanitary, and healthy jail conditions, and to be free from punishment;

    ii.     Defendant's conduct has violated Plaintiffs' and class members' Eighth Amendment rights to be free from cruel and unusual punishment;

    iii.    Defendant's conduct has violated Plaintiffs' and class members' First Amendment rights to be free from retaliation when in engaging in protected conduct, such as filing grievances;

d.      Enjoin the Defendant, its agents, officers, employees and successors in office, along with those acting in concert with them, from engaging in the unlawful practices described herein;

    i.      Issue an order that the Workhouse be closed, all pretrial detainees released, and all post-conviction detainees relocated;

    ii.     To the extent that the Defendant is allowed to continue to house detainees at the Workhouse, issue an order requiring Defendant to pay a fine of $10,000 per day until such time that the City demonstrates the capacity to operate the facility in accordance with constitutional requirements, including but not limited to renovation, repair, and acquisition or installation of necessary devices and equipment to ensure proper ventilation and temperature control; complete and adequate remediation of unsafe and unsanitary conditions such as mold, sewage overflow, and infestations; and adoption of policies, training, supervision, and monitoring to correct staff misconduct and detainee oversight;

e.      Award Plaintiffs and class members monetary damages as the Court deems appropriate, as well as all litigation costs, expenses, and attorneys' fees recoverable under federal law; and

f.      Allow such other and further relief as this Court deems just and proper.

Dated:  June 1, 2018                           Respectfully submitted,

                                          By: */s/ Nathaniel R. Carroll*
                                              Blake A. Strode (MBE #68422MO)
                                              Michael-John Voss (MBE #61742MO)
                                              Jacki Langum (MBE #58881MO)

Nathaniel R. Carroll (MBE #67988MO)
John M. Waldron (MBE #70401MO)
Sima Atri (MBE #70489MO)
**ARCHCITY DEFENDERS, INC.**
1210 Locust Street, 2nd Floor
Saint Louis, MO 63103
Tel: (855) 724-2489
Fax: (314) 925-1307
bstrode@archcitydefenders.org
mjvoss@archcitydefenders.org
jlangum@archcitydefenders.org
ncarroll@archcitydefenders.org
jwaldron@archcitydefenders.org
satri@archcitydefenders.org
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that notice of the foregoing and a copy of the same was distributed via this Court's ECF/PACER electronic filing notification system to all counsel of record on this 1st day of June, 2018.

/s/ *Nathaniel R. Carroll*