1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MISSOURI

3                  EASTERN DIVISION

4

5    JAMES CODY, et al.,

6         Plaintiffs,

7    v.                    Cause No. 4:17-cv-2707

8    THE CITY OF ST. LOUIS,

9         Defendant.

10                ~~~~~~~~~~~~~~~~~

11              30(b)(6) Deposition of

12               The City of St. Louis

13         (Designee Witness:  JAMIE LAMBING)

14

15                August 14, 2018

16                  1:14 P.M.

17

18                  Taken at:

19            City of St. Louis City Hall

20               1200 Market Street

21            Law Department, Room 314

22              St. Louis, Missouri

23

24

25                    J. Bryan Jordan, CCR—MO


                                              2


 1   APPEARANCES:

 2

 3   On behalf of the Plaintiffs, JAMES CODY, et al.:

 4        ArchCity Defenders, Inc., by

 5             NATHANIEL R. CARROLL, ESQ.

 6             1210 Locust Street

 7             St. Louis, MO  63103

 8             (855) 724—2489, Ext. 1012

 9             ncarroll@archcitydefenders.org

10

11   ALSO PRESENT:

12             Emanuel Powell, Law Intern

13

14

15   On behalf of the Defendant, THE CITY OF ST. LOUIS:

16        St. Louis City Counselor's Office, by

17             ANDREW D. WHEATON, ESQ.

18             City Hall, Room 314

19             1200 Market Street

20             St. Louis, Missouri  63103

21          (314) 622-4394

22          WheatonA@stlouis.mo.gov

23

24

25

                                                        3

1                    TRANSCRIPT INDEX

2

3    APPEARANCES ................................    2

4

5    INDEX OF EXHIBITS ..........................    4

6

7    EXAMINATION OF JAMIE LAMBING:

8    BY MR. CARROLL .............................    5

9

10

11   REPORTER'S CERTIFICATE .....................   74

12

13   EXHIBIT CUSTODY

14   EXHIBITS RETAINED BY COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

4

1                         INDEX OF EXHIBITS

2      NUMBER                    DESCRIPTION                  MARKED

3      Plaintiff's Exhibits:

4      Exhibit 1 —— Third Amended Notice of
                    Deposition (No Bates stamps) .......   6
5
       Exhibit 2 —— Photographs from inside of
6                   shipping container, Bates stamps
                    CODYETAL_006075, 76, 78, 79, 80, 81,
7                   85, 86, 87, 89, 90, 92, 94, 95, 96,
                    98, 100, 101, 103, 105, 107, 109,
8                   110, 111, 113, 115, 118, 120, 121,
                    122, 123, 124, 125, 126, 127, 128 ..  21
9
       Exhibit 3 —— 7/20/2017 daily temperature
10                  report (No Bates stamps) ..........  52

11     Exhibit 4 —— Documents re Inmate No. 146388,
                    Bates stamped CODYETAL_5343 through
12                  5372 (Designated on the record as
                    confidential) .....................  58
13
       Exhibit 5 —— IJMS Incident Report dated
14                  1/11/2017, Bates stamped
                    CODYETAL_3912 and 3913 ............  60
15

16

17

18

19

20

21

22

23

24

25

5

1                    JAMIE LAMBING,

2    of lawful age, having been first duly sworn to testify

3    the truth, the whole truth, and nothing but the truth

4    in the case aforesaid, deposes and says in reply to

5    oral interrogatories propounded as follows, to-wit:

6                        EXAMINATION

7    QUESTIONS BY MR. CARROLL:

8        Q.   All right, good afternoon.  My name is

9    Nathaniel Carroll, and I'm an attorney with Arch City

10   Defenders.  I'm joined by one of our law interns,

11   Emanuel Powell today, and we, our firm represents

12   seven plaintiffs, individually and on behalf of a

13   class, in an action called Cody, et al., vs. City of

14    St. Louis.  We've asked you to come here, today, to

15    talk about some different topics related to records at

16    the Medium Security Institute.

17            Do you want to go ahead and spell your name

18    for the record, so we don't misspell it?

19        A.    That's J-a-m-i-e is the first name, Lambing,

20    L-a-m like "money," "b" like "bank," -i-n-g.

21        Q.    Very good.  Have you ever given a deposition

22    before?

23        A.    Yes.

24        Q.    About how many times?

25        A.    Three or four.

                                                        6

1         Q.    Okay, so you probably recall from past

2     depositions the general rules, and you are doing a

3     good job already of one of the most important ones,

4     which is that we don't talk over each other like we

5     might in a normal conversation.  I'll do my best to

6     wait until you are done speaking before I ask you a

7     question, and I ask you to do the same.  Does that

8     make sense?

9         A.    Yes.

10        Q.    Very good.  You are also doing a good job of

11    the other important thing, which is to say "Yes," or

12    "No," or to speak an answer, rather than nod your

13    head.  Does that make sense?

14         A.   Yes.

15         Q.   Okay.  If I ask you a question that's

16    confusing or that you don't understand, please let me

17    know, because otherwise, if you answer, I will assume

18    that you understood the question.  Is that fair?

19         A.   Yes.

20         Q.   Okay, great.  How are you feeling today?

21         A.   I am fine.

22         Q.   You are good.  Okay, good.

23              (Plaintiff's Exhibit 1

24              marked for identification.)

25         So I'll go ahead and hand you the first

                                          7

1     exhibit we've marked as Exhibit 1, and this is the

2     Third Amended Notice of Deposition.  The amendments

3     that happened to it were for the locations, but on the

4     second page of this exhibit, we've listed several

5     topics.  Have you seen this document before?

6          A.   Yes.

7          Q.   Okay, good.

8               MR. WHEATON:  Nathaniel, at this point,--

9          MR. CARROLL:  Yeah,--

10          MR. WHEATON:  --I'd just like to--

11          MR. CARROLL:  --I'm about to cover--

12          MR. WHEATON:  --cover our agreement.

13          MR. CARROLL:  Right.

14    BY MR. CARROLL:

15          Q.   So prior to this deposition, after we issued

16    this notice, I had a chance to talk to the City's

17    attorney, Andrew Wheaton here, about this notice, and

18    he said that for topics 1-b., topics 2 and 3, that you

19    would, you would be able to testify so to speak, on

20    the City's behalf, but that for the first topic, 1-a.,

21    as it relates to electronic records and systems, that

22    you can tell us what you know, but we might have to

23    ask someone else about the sort of information

24    technology side of things.  Is that accurate?

25          A.   Yes.

                                                    8

1          Q.   Okay.

2               MR. WHEATON:  And just to be clear, for

3    topic 1-a., Ms. Lambing is not the City's designee.

4    For topic 1-b., she is the City's designee, with the

5    exception of the subcategories for budgeting/finance,

6    Human Resources compliance, and e-mail communications.

7         There is one caveat I'd like to add that we

8    haven't had a chance to discuss yet.  In terms of

9    booking, and inmate classification and management, it

10   may be necessary for the--you know, it depends how

11   in-depth you want to get on booking, but booking is

12   technically a process that is handled by the St. Louis

13   Metropolitan Police Department's--

14         MR. CARROLL:  Okay.

15         MR. WHEATON:  --Prisoner Processing

16   Division.  She's not an expert in their procedures--

17         MR. CARROLL:  Okay.

18         MR. WHEATON:  --or records.

19         MR. CARROLL:  That's great, and that is

20   helpful info, and so we won't spend much time bugging

21   you about that one, Ms. Lambing.

22   BY MR. CARROLL:

23   Q.    Okay.  Before--before we go any further, I

24   wanted to let you know that in this case, there's a

25   protective order in place, and so you might see

                                              9


1    information in the documents that we look at today

2    that has confidential information from inmates that

3    may, at some point, even if it's not labeled today, be

4    labeled protected and confidential, so I just ask that

5    you don't share any information that you see on the

6    documents today with anyone outside of your attorneys

7    or this room.  Can you agree to that?

8        A.   Yes.

9        Q.   Okay, great.

10            Did you do anything to prepare for your

11   deposition today?

12       A.   Yes.

13       Q.   What did you do?

14       A.   I went through these topics with The City

15   Counselor's Office and reviewed what records we had.

16       Q.   Okay, great, so having done that, you feel

17   that--or are you in the best position to tell me if a

18   certain type of record would exist or is kept in the

19   normal course of business by the Medium Security

20   Institute?

21       A.   Yes.

22       Q.   Okay.  Great.  What is your current job

23   title?

24       A.   Records Retention Supervisor.

25       Q.   And is that for the entire City of

1   St. Louis?

2        A.   No, for the Division of Corrections.

3        Q.   Okay, and what falls under the Division of

4   Corrections?

5        A.   That would be the Division of Corrections.

6   That's the jail, and that's once a person is in

7   custody.

8        Q.   Okay, and that--when you say "the jail," do

9   you mean both the Criminal Justice Center and the

10  Medium Security Institute?

11       A.   Yes.

12       Q.   Okay.  If I say "MSI," you understand that

13  to mean Medium Security Institute?

14       A.   I do.

15       Q.   Okay, have you heard anyone call it "the

16  workhouse" before?

17       A.   I have heard it called that.

18       Q.   Do you prefer "MSI" or "workhouse"?

19       A.   MSI.

20       Q.   Okay, then that's what we'll call it today.

21            So prior to having this position at MSI, or

22  excuse me, the Department of Corrections, did you work

23  for the City in any capacity?

24       A.   I have worked for the City in a previous

25  capacity.

1       Q.    And what was that?

2       A.    I was the Records Manager for the Collector

3    of Revenue's office.

4       Q.    How long did you do that job?

5       A.    Over seven years.

6       Q.    Okay, and then after that, did you go

7    straight to the Department of Corrections?

8       A.    No, I did not.

9            MR. WHEATON:  Just a point of clarification;

10   it's the Division of Corrections.

11           MR. CARROLL:  Excuse me.  Yeah.  Very good;

12   Division of Corrections.

13   BY MR. CARROLL:

14      Q.    So where did you go after the Recorder's

15   Office?

16      A.    Collector's Office.

17      Q.    Collector's Office; okay.

18      A.    The St. Louis County Library.

19      Q.    Okay, and what was your job there?

20      A.    Circulation.

21      Q.    Okay, and when did you start working for the

22   Division of Corrections in St. Louis City?

23      A.    March 25th, 2013.

24     Q.   And that was the--your current job title is

25     the same one you received when you started?

                                                              12

1      A.   Yes.

2      Q.   Okay.

3           Do you have any--what's your highest level

4      of education?

5      A.   I have two years towards a Master's program,

6      but I didn't finish it.

7      Q.   Okay, what were you studying?

8      A.   English.

9      Q.   Very good, and then so you, presumably,

10     graduated from college?

11     A.   Yes.

12     Q.   Where did you go to college?

13     A.   University of Missouri-Rolla.

14     Q.   And what did you study there?

15     A.   History and English.

16     Q.   Okay, good.  Other than working for the

17     Collector's Office and the Division of Corrections,

18     have you worked for the City of St. Louis in any other

19     capacity?

20     A.   I have not.

21        Q.    Okay.  Do you have an immediate supervisor?

22        A.    I do.

23        Q.    What is their name?

24        A.    Dale Glass, Commissioner.

25        Q.    Okay, and that's Commissioner of the

                                                    13


 1    Division of Corrections?

 2        A.    Correct.

 3        Q.    Do you have any subordinate employees?

 4        A.    I do.

 5        Q.    How many?

 6        A.    Currently, I have two.

 7        Q.    Okay, and what do they do?

 8        A.    They process records and help me with

 9    records requests.

10        Q.    Okay.  What do you mean by "process

11    records," or can you describe that to me?

12        A.    When records come in, we inventory them,

13    sometimes organize them, depending on the state of the

14    records.  We prepare them for when they are--when they

15    reach retention, we put that date on there, and we

16    keep the inventory, and when asked for information

17    from those records, we pull them.

18        Q.    Okay, so in the normal course of your job,

19    is it fair to say that you are responsible for

20    organizing the records in a certain way?

21        A.    Correct.

22        Q.    Okay, and it's important to organize them so

23    that you can find them later; is that correct?

24        A.    Correct.

25        Q.    Okay.  Do you have--is there a particular

                                                        14

1    method by which you organize them?

2         A.    Not really.  We can do them alphabetical,

3    chronological, we can keep them in the order they came

4    in, so it just depends on the type of records, and how

5    they were given to us, and how the individual that

6    gave them to us would request them.

7         Q.    Okay.  When--right now, in 2018, does your

8    office digitize or scan any of the records?

9         A.    We do not.

10        Q.    Okay, so you keep paper files, correct?

11        A.    Yes.

12        Q.    Okay.  When records come in, do you make

13    photocopies of them?

14        A.    Only if requested.

15        Q.    Okay, and who would be submitting records to

16    your office?

17         A.    The Division of Correction employees, any

18    office where there are papers created.

19         Q.    And where is your office located?

20         A.    My office is currently located at CJC.

21         Q.    Okay, and are records from MSI, let's say

22    they're generated today and they need to be filed in

23    your office.  Do they need to come to CJC?

24         A.    Currently, no.

25         Q.    Where do they go currently?

                                                    15


1          A.    Currently, they're at MSI.

2          Q.    Okay, and anywhere in particular at MSI?

3          A.    At this point, we are looking for a place to

4     put them.

5          Q.    Okay, so until then, does everyone at MSI

6     just have to hold onto their paperwork?

7          A.    Sometimes.  Sometimes, they send them to

8     Maintenance.

9          Q.    Maintenance?  Does Maintenance have some

10    place to store them?

11         A.    Not really.

12         Q.    Not really; okay.  Do you know what

13    Maintenance does with––

14      A.   They put them––they stack them in a corner.

15      Q.   Okay, until you can find some space?

16      A.   Yes.

17      Q.   Okay.  How long have you been looking for

18   space to store these records?

19      A.   June.

20      Q.   Since June?

21      A.   Of 2018.  (Nods head in affirmative manner).

22      Q.   Okay.  Prior to then, you had additional

23   space somewhere?

24      A.   Yes, I did.

25      Q.   Where was that?

16

1       A.   That was in CJC, one of the pods, 5 Charlie.

2       Q.   Okay, so "5 Charlie" meaning a 5C?

3       A.   Mm–hmm.  (Nods head in affirmative manner).

4       Q.   Okay, and what is a pod?

5       A.   A pod is a place where they keep inmates.

6    It's a discrete unit that they house inmates in.

7       Q.   Multiple inmates?

8       A.   Multiple.  (Nods head in affirmative

9    manner).

10      Q.   And when the records were in 5 Charlie,

11    there were not inmates accessing them, correct?

12         A.    There were no inmates in 5 Charlie.

13         Q.    Okay, so prior to--so I think it sounds

14    like, from your timeline, we know that June 2018 is

15    sort of a transition date, and prior to June 2018,

16    were documents from both CJC and MSI in that 5 Charlie

17    pod?

18         A.    Yes.

19         Q.    Okay, and they would get there through your

20    office; is that correct?

21         A.    Maintenance from MSI would bring them up.

22         Q.    Okay, so is there any particular reason that

23    Maintenance brings the documents?

24         A.    Because they have access to vehicles.

25         Q.    Okay.  Okay, very good.  So not every MSI

                                                          17


1     employee has a City vehicle that they can transport

2     file boxes in?

3          A.    Correct.

4          Q.    Okay.

5          A.    And not only that, but that many.

6          Q.    That many; okay.  About how many boxes on--

7     before you moved, about how many boxes do you estimate

8     were in the 5 Charlie pod?

9       A.    Um, I would say--I can't estimate boxes.  I

10   would--12 to 14 tons.

11       Q.    Okay, did you have a way to weigh them?

12       A.    Yes, the boxes.  I--yes.  I just don't

13   remember the number.  I know that when I did the math,

14   they were 12 to 14 tons.

15       Q.    Wow.  Okay, so how did you do the math?  Did

16   you calculate--

17       A.    I know how much a box weighs.

18       Q.    Okay.

19       A.    I just have lost the number of the boxes.

20       Q.    Okay, so you took the approximate weight of

21   a box times the number of boxes that you--

22       A.    A document box weighs between 35 and 40

23   pounds.

24       Q.    Okay, good, and so the total ended up being

25   between, you said, 12 and 14 tons?

                                              18


1       A.    That was our estimate.

2       Q.    Okay, and then after June 2018, you moved

3   the documents, correct?

4       A.    I didn't.  I had help moving them.

5       Q.    Who helped you move them?

 6      A.   My clerk and the Division of Correction

 7  (sic) personnel.

 8      Q.   How many?  How many personnel?

 9      A.   Eight.  Eight.

10      Q.   Okay.  When they were moved, did you give

11  them any instruction on organizing the documents?

12      A.   I tried to.

13      Q.   Okay.  What do you mean by "I tried to"?

14      A.    I definitely had a plan going into it, but

15  by the time we got there and we were under a time

16  crunch, at a certain point, I lost intellectual

17  control of the records.

18      Q.   Okay.  Okay.  Prior to moving them, did you

19  take an inventory--

20      A.   Yes.

21      Q.   --or keep a log?

22      A.   Yes.

23      Q.   Okay, do you still have that log?

24      A.   Yes.

25      Q.   Excellent.

                                                    19


 1      A.   And I turned it over to Counsel.

 2      Q.   Okay, good, so we could ask Andrew for a

 3  copy, then.

 4      A.    (Nods head in affirmative manner).

 5      Q.    On that log, how is it organized?

 6      A.    It's just a straight inventory.

 7      Q.    Does it list--are the boxes numbered?

 8      A.    Some of the boxes were, some of them

 9  weren't.

10      Q.    Okay.  Were they numbered prior to being

11  moved?

12      A.    Some of them were, some of them weren't.

13      Q.    Okay.

14      A.    Some of them were alphabetical.

15      Q.    Okay, and then the, the log, is that

16  something that you wrote out by hand?

17      A.    It was written out by hand and then put

18  into, probably, a Word document or an Excel document.

19  I don't know.

20      Q.    Okay, and you gave your attorneys a paper

21  copy of that?

22      A.    I sent them a digital copy, yes.

23      Q.    A digital copy; great.  Okay.  So if you had

24  that log in front of you and we went to look at the,

25  the documents as they are today, would you be able to

                                                       20

1   pick an entry on the log and find a box where they

2   are?

3        A.   Probably not.

4        Q.   Okay.

5        A.   Some, maybe, but ultimately, no.

6        Q.   Okay.

7        A.   That's what it means by losing intellectual

8   control.

9        Q.   Tell me more about that.  I've never heard

10  that term before.  What do you mean by losing

11  intellectual control?

12       A.   It means that I had a way to find documents.

13       Q.   Okay.

14       A.   Prior to that, I knew where they were, I

15  could go and find them, I knew which box they were in,

16  I could pull the box, I could pull the file, and it

17  took a relatively short period of time.

18       Q.   Okay, and how were you able to do that?

19            Let me rephrase that.  How were they

20  organized at the 5 Charlie pod?

21       A.   I had to organize the rooms, the cells, into

22  different types, record series.

23       Q.   Okay.

24       A.   So depending on the record series, I could

25  go to the cell and find it in a fairly short period of

1    time.

2        Q.    Okay, and your goal when you started out was

3    to keep some sort of--

4        A.    Yes.

5        Q.    --semblance of that system?

6        A.    My clerk and I actually worked out a goal

7    and actually planned what boxes went where, but I

8    didn't--wasn't able to maintain it.  I couldn't keep

9    them in order.

10       Q.    So I'm going to give you a stack that we'll

11   mark just as Exhibit 2.

12                  (Plaintiff's Exhibit 2

13                  marked for identification.)

14              Andrew, these are a printout of--from the

15   production that we gave you yesterday, City 6075

16   through 6128, and we're not going to look at all of

17   them.  I just printed--I'll show them to you if you

18   want.  I just printed one copy because--

19              MR. WHEATON:  That's okay.

20              MR. CARROLL:  --I didn't want to use up a

21   bunch of color ink, and we'll look at these together.

22   BY MR. CARROLL:

23       Q.    Do you recognize what this picture depicts?

24      A.    Yes.

25      Q.    Okay, what is this?

                                                      22

1       A.    This is the inside of a shipping container

2    at MSI.

3       Q.    Okay, and so this is page number 6075,

4    inside a container.  Is 6076 also––

5       A.    Yes.

6       Q.    ––the same picture?

7       A.    Yes.

8       Q.    Or the same conditions?

9       A.    The same––it's a shipping container.

10      Q.    So we won't have to go through all of them.

11            And is this page, 6080, that is a shipping

12   container, correct?

13      A.    Yes, it is.

14      Q.    Okay.  How––is there any time limit on how

15   long this shipping container can sit there?

16      A.    I don't know.

17      Q.    Do you know if the City owns it or rents it?

18      A.    We rent it.

19      Q.    Okay, and to your knowledge, has it been

20   moved since you put the boxes and files in there?

21      A.   To my knowledge, no.

22      Q.   Okay.  Do you have access to this?

23      A.   Yes.

24      Q.   How do you access it?

25      A.   There's a key.

23

1      Q.   Okay, and so you keep it locked?

2      A.   Yes.

3      Q.   And if anyone needs to put records in or
4  take records out, they have to come through you?

5      A.   To take records out, yes.

6      Q.   No one is putting more records in this right
7  now?

8      A.   No.  There's no room.

9      Q.   If, at the MSI, there are records being
10  kept, they might go to Maintenance, they might just
11  stay in place?

12      A.   They will not go in there.  There is no room
13  in that container.

14      Q.   Okay, very good, and maybe what I'd like you
15  to do is just look through here and make sure that you
16  recognize everything here.  You don't have to describe
17  it, but if there's anything, any picture that, for
18  some reason, doesn't ring a bell, let me know.

19    Otherwise, we'll just make sure that we're talking

20    about the same shipping container.

21                    (Witness peruses photographs in

22                    Plaintiff's Exhibit 2.)

23    A.    Yes, these are all from the shipping

24    container at MSI.

25    Q.    And then I'd like you to look at what I'm

24

1    going to mark––so some boxes, like this one on page

2    6086, would you read the top of that list, there?

3    A.    "MISC FINANCIAL RECORDS."

4    Q.    Does that mean "miscellaneous"?

5    A.    Yes.

6    Q.    And are you able––is the rest of this piece

7    of paper on the front of that box, is that more or

8    less an index for that particular box?

9    A.    Yes.

10    Q.    Okay.  Did every box that was put in the

11    shipping container have an index?

12    A.    Um, no.

13    Q.    Okay.  Okay.

14    A.    Some did, some didn't, and some were

15    internal, some were external.  Some were in the boxes,

16    some were outside the box.

17         Q.   So if it's not on the outside, we might have

18    to look inside the box?

19         A.   Correct.

20         Q.   And if it's not inside the box, as well,

21    then——

22         A.   There isn't one.

23         Q.   Okay, and so, then, we'd have to look at

24    each piece of paper to index it?

25         A.   Correct.

                                                        25


1          Q.   On page 6087 of Exhibit 2, it's an open tub,

2     it looks like.

3          A.   Yes.

4          Q.   And there's a piece of paper on top that

5     says "Medical Records Invoices—Paid."  Do you see

6     that?

7          A.   Yes, I do.

8          Q.   Do you know if this box is containing

9     medical record invoices?

10         A.   N——yes, it is.

11         Q.   How can you tell?

12         A.   Because that's what it says.

13         Q.   Okay, so this paper belongs with this box?

14      A.   Yes.

15      Q.   Okay, good, and then some boxes do have a

16 storage label.  Did you create these labels?

17      A.   Yes, I did.

18      Q.   Okay, they're very organized.

19      A.   Yes.

20      Q.   Is this part of your system of keeping

21 track?

22      A.   Yes.

23      Q.   Okay, and so for this particular box on page

24 6089, you have listed "Record Series:  PAYROLL."  What

25 is a record series?

                                                      26


1      A.   It is a discrete unit of records that go

2 together.

3      Q.   Okay, and then is there an even more

4 discrete subseries or subcategory within each series?

5      A.   There can be, based on the series.  In this

6 case, payroll records could be OTA, which is what it

7 says, which is overtime adjustment.

8      Q.   Okay.

9      A.   So those are specific, so we would keep

10 those together.

11      Q.   And looking at this particular box, we

12  would––is "MSI," that's Medium Security Institute?

13      A.   Mm–hmm.  (Nods head in affirmative manner).

14      Q.   Okay, so we know that records in this box

15  are related to MSI overtime adjustments and they're

16  from the payroll records series?

17      A.   Right.  Well, the unit they came from is

18  Personnel.

19      Q.   Oh, okay, so––

20      A.   It all breaks down when you read it as the

21  numbers go down.

22      Q.   Okay, so you start at "Section/Unit."

23      A.   (Nods head in affirmative manner).

24      Q.   And what are the different sections or units

25  that you might get documents from, from the MSI?

                                                27


1       A.   Personnel––pay, Personnel, Chief of

2   Security, Administrative, those are the ones that pop

3   out at me.

4       Q.   Does Maintenance fall under Personnel?

5       A.   Maintenance.  Sorry.  Thank you.

6       Q.   Maintenance is separate?

7       A.   Yeah, Maintenance would have their own

8   because––their own section.

9      Q.   Okay.  Where--what about inmate records?

10     A.   Inmate records would fall under a couple of

11  categories; Social Services.

12     Q.   Social Services.  Any other categories?

13     A.   Social Services would include Constituency

14  Service Unit, which would have its own category

15  because they're a discrete unit.

16     Q.   Okay.  Okay, and where--what section or unit

17  would inmate grievance forms or complaint forms fall

18  under?

19     A.   Constiuency Service Unit.

20     Q.   And do you call it the CSU?

21     A.   CSU.

22     Q.   Okay, so Constituency Service Unit, CSU;

23  okay.

24          Here's another box on page 6090 with a

25  section/unit of "Business Office."  Is that another

                                                    28


1  section or unit--

2      A.   Yes.

3      Q.   --that you receive records from?

4      A.   But not at MSI.

5      Q.   Okay, so looking on this box, is there a way

6   for--is there anything on here that indicates it's not

7   from MSI?

8        A.   Well, it's Business Office.  Business Office

9   is at CJC.

10       Q.   Okay.  Now, does the Business Office handle

11  any business for the MSI?

12       A.   Yes,--

13       Q.   Okay.

14       A.   --they do.

15       Q.   So there might--in this particular box that

16  says financial records from the Business Office, it

17  might have records that relate to the MSI?

18       A.   Correct.

19       Q.   But also the CJC?

20       A.   Correct.

21       Q.   Okay.

22       A.   But the unit is at CJC.

23       Q.   That makes sense.  So if we wanted to see

24  financial records for this fiscal year 2013 for MSI,

25  we'd have to sort through this box?

                                                    29

1        A.   Correct.

2        Q.   Okay, so this box on page 6094 is labeled

3   "MSI August 2012," correct?

4       A.   Correct.

5       Q.   And what does this writing mean?

6       A.   Institutional transfers, movement sheets,

7    housing inspection, so it would mean people that had

8    been transferred from CJC to MSI or from MSI to CJC.

9    Movement sheets would be movement within the facility.

10   Housing inspection would be that particular housing

11   unit had been inspected, and I don't know what would

12   be on the form.

13      Q.   Okay, and so, so there at some point--well,

14   records in here meaning at some point, an inmate was

15   either transferred to CJC from MSI or went to MSI,

16   correct?

17      A.   Correct.

18      Q.   Okay, and what's this red X mean on the box?

19      A.   The red X means that it's out of retention.

20      Q.   What is retention?

21      A.   Retention is the time period we have to keep

22   it by State statute.

23      Q.   And do you know how long that is?

24      A.   Yes, five years.

25      Q.   Five years from the time it's received or

                                                        30

1   created?

2        A.   From the time it's created.

3        Q.   Okay, and so how--are all the documents in

4   this box created on the same day?

5        A.   Well, they're in August of 2012.

6        Q.   Okay.

7        A.   So if I were creating a retention schedule,

8   I would keep them until September 2017.

9        Q.   Okay, and then after the retention period of

10  five years expires, what is the City's procedure for--

11       A.   They're securely shredded according to state

12  statues.

13       Q.   Okay, and when they are shredded, is any

14  sort of log or archives kept of what was destroyed?

15       A.   Yes.

16       Q.   Okay, and do you maintain those records?

17       A.   Yes.

18       Q.   And you have some you started in 2013?

19       A.   Since I started doing the shredding.  I

20  don't know when I started doing the shredding--

21       Q.   Okay.

22       A.   --in reference, but I didn't start in March

23  of 2013.

24       Q.   In March of 2013, was anyone else doing

25  shredding?

1       A.   I don't know.

2       Q.   Okay.  On page 6095, these are--look like

3    sturdier gray boxes here, and--

4       A.   Gray Tuffs.

5       Q.   And am I correct that these are CJC, that's

6    from the Criminal Justice Center?

7       A.   Yes.

8       Q.   Do you know if all the records in this

9    particular box we're looking at, here, in the middle

10   of the page, are from CJC?

11      A.   I don't know.

12      Q.   We'd have to look inside?

13      A.   I'd have to look inside.  I'm not quite sure

14   what type of releases those are.

15      Q.   And then we see this 2008 release, so that's

16   how you knew there might be releases in here?

17      A.   Yeah, but I'm not sure what type of

18   releases.

19      Q.   That's fine, and this has a red X, again,

20   because of the retention--

21      A.   It's past the five-year retention.

22      Q.   Okay, but you keep these for what purpose?

23      A.   I hadn't gotten around to shredding them.

24        Q.   Oh, okay.  All right, and at some point, you

25   probably learned there was a lawsuit where these

                                                    32

1    records might--

2         A.   Yes.

3         Q.   --become important?

4         A.   I was told not to shred.

5         Q.   Very good.  Okay.  Do you know what this

6    piece of paper is on page 6096?

7         A.   Yes.  That's a crude inventory of what's in

8    that box.

9         Q.   What's in this particular box?

10        A.   Yeah.  I don't know, I can't tell what kind

11   of--oh, it's a gray Tuff.

12        Q.   Okay.

13        A.   I can't tell, I couldn't tell if--yeah, it's

14   an inventory of what's in the box.

15        Q.   Okay.  Okay, and picture 6103, there's a

16   stack of one, two, three, four, five boxes high, and

17   the second box from the bottom on the left side,

18   there's a little note, there.  Do you see it?  I think

19   it says, "Mixed."  Is that correct?

20        A.   Yes.

21      Q.   What does that mean?

22      A.   It's a mix of intakes.

23      Q.   From--a mix--what are you mixing together?

24      A.   Mix from time periods.

25      Q.   Okay, so it would be some from 2007, some

                                                        33

1   from 2008?

2       A.   Yes.

3       Q.   Okay.  Within these boxes, do you know if

4   these intakes were kept chronologically?

5       A.   I don't know.

6       Q.   Okay.  Okay, on--this is picture 6107.

7   There's a piece of paper on the ground.  Is that meant

8   to be on the ground?

9       A.   It fell off.

10      Q.   Fell off of a box?

11      A.   Yeah.

12      Q.   All right.

13      A.   The tape doesn't stick to those gray Tuffs.

14      Q.   Okay.  There's a box in this picture, 6105,

15   with a label that says "Chief of Security."

16      A.   (Nods head in affirmative manner).

17      Q.   Where is that section or unit?

18      A.   I think in either CJC or MSI.  I would have

19    to check the records on the inside to know.

20         Q.    Okay.  All right.

21              MR. WHEATON:  Are you doing okay?

22              THE WITNESS:  Mm-hmm.

23              MR. CARROLL:  Yeah, anytime you need a--

24              THE WITNESS:  No, I'm--

25              MR. CARROLL:  --break, you can--

                                                      34


1              THE WITNESS:  I'll be fine.

2              MR. CARROLL:  And I understand you want to

3    get out of here by 5:00, and we'll make sure we do

4    that, too, so--I hope so.  I'd like to do that.

5    BY MR. CARROLL:

6         Q.    This is page 6109, and these look like

7    Rubbermaid or Tupperware plastic tubs.

8         A.    Mm-hmm.  (Nods head in affirmative manner.

9         Q.    And I think there were six of them, correct?

10        A.    Yes, sir.

11        Q.    And on the top of them, what do you see

12   written there?

13        A.    "Moldy records."  That's my handwriting.

14        Q.    That's your handwriting.  Why did you write

15   that on there?

16          A.    Because there are moldy records inside of

17    it.

18          Q.    Okay, where did those records come from?

19          A.    They came from the lower level of CJC, and

20    they came up moldy.

21          Q.    Okay.

22          A.    I--and they're--they are a biohazard.

23          Q.    Okay.   Prior to being in the lower-level of

24    CJC, did any of them come from the MSI facility?

25          A.    No.

                                                          35


1           Q.    Okay.

2           A.    They did not.

3           Q.    All right, and are these--are these records

4     that are still within the five-year period?

5           A.    No.   These are records that could be

6     shredded but they're a biohazard, so I have to figure

7     out a way to shred them safely.

8           Q.    Okay, but without opening them and digging

9     through the biohazard, are you confident that these

10    documents do not contain any MSI records?

11          A.    They are CJC Chief of Security records.

12          Q.    Okay, so we may not need to open them.

13          A.    Don't.

14          (Laughter)

15     Q.    We were warned.

16     A.    They were--the problem with moldy records--

17 I'm sorry, I know you didn't ask this, but I am

18 concerned about that, because if you open them, the

19 spores could come out and infect all of the records,

20 and I don't want that to happen.

21     Q.    Okay.  Have you--have you had that happen to

22 other records that you've maintained before?

23     A.    In the past, I have experienced moldy

24 records before, yes.

25     Q.    Okay, ever through the--with the MSI?

                                                        36


1      A.    No.

2      Q.    Okay.

3      A.    This is when I worked for the Division--for

4 the Army Corps of Engineers.

5      Q.    Okay, and that's before the Collector's

6 Office?

7      A.    Correct.

8      Q.    Okay, and what ultimately happens to

9 documents that are infected or tainted with moldy

10 spores?

11          A.    Basically, they--goes throughout the

12    records, and it can eat the whole record and then you

13    can't read them, and they're hard to shred because you

14    can't just shred them with regular paper.  It's a

15    complicated issue.

16          Q.    Okay.  Does the City have a policy, any

17    written policy with regard to how to dispose of those

18    records?

19          A.    Not that I'm aware of.

20          Q.    Okay.

21          A.    It's just my past experience that makes me

22    try to figure out how to get rid of them.

23          Q.    Okay, and do you do, in your--in your

24    current office where you keep records, do you have any

25    way of preventing mold from growing on documents?

                                                          37


1          A.    Yes.  We have had problems before where I

2     followed procedures to protect records from getting

3     moldy, and we were able to save several boxes in the

4     past.

5          Q.    Okay.  Do you know what kind of procedures

6     you would use?

7          A.    Yes.  You want to spread them out so they

8     try separately in an open area where they have plenty

9   of air and plenty of light.

10      Q.   Okay, so that's if they got wet, then you

11  would--

12      A.   Yes.  We've had records get wet before, and

13  since I've been there, that hasn't happened.

14      Q.   Okay, very good.  We'll knock on wood,--

15      A.   Yes.

16      Q.   --hope it stays that way.

17      A.   We actually saved several boxes of medical

18  records.

19      Q.   By drying them out and then making sure they

20  were clean?

21      A.   Mm-hmm.  (Nods head in affirmative manner).

22      Q.   Okay, so prior to--I guess in June of 2018,

23  what prompted you to move the records to a shipping

24  container?

25      A.   I was told to do so.

                                              38


1      Q.   By whom?

2      A.   Commissioner Glass.

3      Q.   Okay, and do you know if there are any

4   records in 5 Charlie pod now?

5      A.   There are not.  There are none.

6      Q.   Were——do you know if——did you ask for the

7   records to be kept in a shipping container?

8      A.   I did not.

9      Q.   Okay.  Did you have any idea about where

10  they should be kept?

11     A.   They need to be kept in a records storage

12  facility.

13     Q.   Describe to me what a records storage

14  facility would look like.

15     A.   It would be a big warehouse with shelves,

16  like St. Louis County has.

17     Q.   Would it be climate controlled?

18     A.   More or less.

19     Q.   Humidity controlled?

20     A.   Yeah, more or less.

21     Q.   Okay, and organized?

22     A.   And organized.

23     Q.   Okay.  About how many hours did it take your

24  crew to move all of the documents from——

25     A.   It took two days, and it took, easily, 10

39

1   the first day.  14 or 15 hours.

2      Q.   Total?

3      A.   14 or 15 hours, total.

4          Q.    Okay.

5          A.    Approximately.  I didn't keep good track,

6    but about that.

7          Q.    And is that––is that after you had already

8    made the log of boxes?

9          A.    Yes.  We did that before things were moved

10   out of 5 Charlie.

11         Q.    Okay.  Do you remember the specific dates

12   that you did this?

13         A.    I don't remember the dates, and I do have

14   them in my calendar.  I can e–mail those dates to

15   Andrew.

16         Q.    That would be great.

17         A.    And I actually am thinking that one of them

18   was late May, now that we are talking about it.

19         Q.    Okay.

20         A.    But it was late May, mid June, but I will

21   mail those, e–mail those two dates to Andrew.  I don't

22   know them off the top of my head.

23         Q.    Okay, and the documents in the boxes, here,

24   that you moved from CJC to the MSI shipping container,

25   did you withhold––did you separate or hold back any

40

1    boxes that did not get put in a shipping container?

2         A.   Yes.

3         Q.   And where did those go?

4         A.   Those went to my records room.

5         Q.   Okay, and what types of boxes were held

6    back?

7         A.   Things--we tried to keep things that were

8    still in retention.

9         Q.   Okay.

10        A.   And we tried to keep things, CSU files,

11   because we knew they were needed, so we went through

12   all the boxes, looking for all the CSU files we had so

13   that we could keep those.

14        Q.   Okay, so you went through all of the boxes

15   from the shipping container, or excuse me, from the 5

16   Charlie--

17        A.   5 Charlie.

18        Q.   --and pulled all of the inmate--I'm sorry,

19   what did you call those records, again?

20        A.   Constituency service units, CSU.

21        Q.   CSU records.

22        A.   So if they were in retention--

23        Q.   Mm-hmm?

24        A.   --or if they were CSU, we kept them.

25        Q.   Okay.  About how many boxes did you keep,

41

1    then?

2         A.   I don't know the answer to that one.

3         Q.   More than ten?

4         A.   Yes, definitely more than ten.

5         Q.   More than a hundred?

6         A.   I would say less than a hundred.

7         Q.   Okay, and those are in your current office

8    at CJC?

9         A.   They are in my records room and my office.

10        Q.   Okay, so you have your own working space and

11   the records room?

12        A.   Yes.

13        Q.   Okay, and are they organized in any manner?

14        A.   Yes.

15        Q.   And how are they organized?

16        A.   By records series, and by date, and by where

17   they fit,--

18        Q.   Okay.

19        A.   --and we have a map.

20        Q.   You have a map?

21        A.   Of the room,--

22        Q.   Okay.

23        A.   --so we know where things are in the room.

24      Q.   Is that something that you can make a

25   photocopy of, too,--

                                                              42


1       A.   Yes.

2       Q.   --or is it a very large map?

3       A.   No.  I can make a photo--I can actually send

4    it to Andrew.

5       Q.   Okay, great.  That would be really helpful.

6    Thank you.  Then I don't have to ask you about every

7    box in there, which I didn't plan on doing, but--let's

8    see.  Is there any written policy for the Division of

9    Corrections with regard to retaining records?

10      A.   Yes.

11      Q.   Okay, and who wrote that policy?

12      A.   A committee.

13      Q.   A committee?  Okay.  Were you on the

14   committee?

15      A.   Yes.

16      Q.   Okay.  Do you remember when that happened?

17      A.   I want to say that was February 2016, but

18   I'm not sure.

19      Q.   Okay.  Prior to that approximate time period

20   when these policies were--when you helped create the

21     policies, were there any written record retention

22     policies in place?

23          A.    Yes.

24          Q.    Okay, why were they rewritten?

25          A.    I don't know.

                                                    43

1           Q.    Okay.  Do you keep copies of old policies

2      somewhere in your office?

3           A.    Yes.

4           Q.    Okay, so if we wanted to see the old version

5      and compare it to the new version, you could help us

6      with, provide those documents?

7           A.    Probably.

8           Q.    Probably.  You could at least look for them?

9           A.    Right.

10          Q.    Okay, and now, what is the--what is the

11     general policy or procedure for how documents from the

12     MSI are stored and organized?

13          A.    I can't speak for stored and organized, but

14     I can say the process is that I have to be involved in

15     the process and that they are turned over to me.

16          Q.    Okay.

17          A.    I have a space issue, so--

18          Q.    Okay.

19      A.    --this is where the problem is.

20      Q.    And that's why you described them as being

21   stacked up in a maintenance office?

22      A.    Yes.

23      Q.    Okay.  Okay.  At the MSI, is there a room

24   where someone, or if you needed to, for example, look

25   in the shipping container and pull a box and go inside

44

1   and inspect the records, is there a room where someone

2   can do that?

3      A.    I don't know.

4      Q.    Okay.

5      A.    I don't know.

6      Q.    Do you spend much time at MSI?

7      A.    No, not really.

8      Q.    Okay.  Did Commissioner Glass tell you why

9   he chose a shipping container versus a warehouse?

10      A.    He did not.

11      Q.    Okay.  Do you know how much the City is

12   paying for the shipping container?

13      A.    I don't know.

14      Q.    No?

15      A.    I don't know.  Approximate, $200 or less.

16      Q.   A month?

17      A.   Yes.

18      Q.   Okay.  Okay.  That would be cheaper than a

19 big building, correct?

20      A.   I don't know.

21      Q.   Okay.  Okay, so right now, if we wanted to

22 see--if we wanted to look at all of the inmate

23 complaints related to MSI, where would we look?

24      A.   Those boxes are here in City Counselor's.

25      Q.   Okay.

                                                    45


1      A.   I sent them over--

2      Q.   How many of the--

3      A.   --several weeks.  There were three.

4      Q.   Three boxes?

5      A.   (Nods head in affirmative manner).

6      Q.   Okay.  Before you sent them over, did you

7 organize them in any way?

8      A.   I did.  I tried to.

9      Q.   Okay.  What was that process like?

10     A.   Looking at what was there and trying to

11 figure out how to organize it.  Some were alphabetical

12 by inmate, and some were by date.

13     Q.   Okay, and when you were doing that process,

14   did you--did you omit any records?

15        A.   No.

16        Q.   Okay.  Good.  We'll take a look at some of

17   those in a little bit, just to make sure that we know

18   what the specific forms are.

19             What about medical complaints, or even just

20   requests for medical care?  Who keeps those records?

21        A.   Not me.

22        Q.   Not you?

23        A.   Medical or CS--or if they're in the CSU

24   records, those would be the two places I've had to

25   pull them that I would go to, but I--

                                                     46

1        Q.   Okay.

2        A.   --those would be--that's all I have.

3        Q.   Okay, so you don't get every piece of paper

4   that the medical providers create?

5        A.   I do not.

6        Q.   Okay, and that--do you know that medical

7   provider to be Corizon?

8        A.   Yes.

9        Q.   So if we needed to see information about

10   what sort of medical symptoms inmates might be having,

11    we would have to ask Corizon; correct?

12        A.   Correct.

13        Q.   Okay.  Do you know of anyone else that we

14    would ask employed with the City?

15        A.   If they were in the CSU records.

16        Q.   Okay, right, so sometimes, they could be in

17    the CSU record?

18        A.   Correct.

19        Q.   Okay.

20        A.   And sometimes, most of the time, they're

21    out, I would say 90-something percent of the time,

22    they go to Corizon.

23        Q.   Okay, so in the photographs we were looking

24    at earlier, there was boxes labeled "Medical Records."

25    Were those kept prior to Corizon––

                                                      47


1         A.   Those were––

2         Q.   ––moving in?

3         A.   Those were not medical complaints.

4         Q.   Okay.

5         A.   They were medical invoices.

6         Q.   Okay, from Corizon, or from––

7         A.   No.

8         Q.   From a different provider?

9       A.    From the Business Office.  Those are

10   invoices for services.  Sometimes, inmates go out for

11   services.

12       Q.    And then the invoices will come to the

13   Business Office?

14       A.    (Nods head in affirmative manner).

15       Q.    And the Business Office does what with them?

16       A.    Pays them.

17       Q.    Okay, and then they keep them in these

18   boxes?

19       A.    Right.

20       Q.    Okay.  Does MSI keep classification records

21   for inmates?

22       A.    I don't know.

23       Q.    Okay.

24       A.    No, I don't know.

25       Q.    Okay.  If you wanted to ask somebody, who

                                                    48


1   would know?

2       A.    Superintendent Carson.

3       Q.    Okay.

4       A.    They do have a classification section.

5       Q.    Okay, but you don't maintain the

6     classifica--a separate category for classification

7     records?

8          A.    No.

9          Q.    Okay.  Do you maintain records related to

10    phone cards?

11         A.    We did.  We do not any longer.

12         Q.    Do you remember when that stopped?

13         A.    August of 2015.

14         Q.    Okay.  Do you know who keeps them now?

15         A.    We don't have--we don't have inmate phone

16    cards anymore.

17         Q.    Okay, so the phone card program, as it were,

18    is no longer--

19         A.    Correct.

20         Q.    --operating.  Okay, and what about

21    commissary account records?

22         A.    Those are kept in an electronic database--

23         Q.    Okay.

24         A.    --with Keefe.

25         Q.    And they're a third-party vendor?

                                                    49


1          A.    Correct.

2          Q.    Okay, but you don't keep paper records of

3     account statements?

4        A.    I do not.

5        Q.    If we did find them, it would be because

6   they're in the CSU file?

7        A.    They could be in the CSU file if there's a

8   problem with an inmate's commissary and they make the

9   complaint.

10       Q.    Does the MSI keep inmate property retention

11  forms or any sort of inmate inventories?

12       A.    I don't know.

13       Q.    Okay.  Do you keep end-of-shift reports from

14  MSI?

15       A.    We do have some--

16       Q.    Okay--

17       A.    --with the Chief of Security records.

18       Q.    Okay, so if we wanted to see reports from

19  corrections officers at MSI that they made during

20  their shift or at the end of the shift, that's under

21  the Chief of Security--

22       A.    Correct.

23       Q.    --umbrella?  Okay.

24       A.    Correct.

25       Q.    And what was--"umbrella" was not the term

1    you used.  What did you call it?

2         A.   Records series.

3         Q.   Series.  Okay, records series; thank you.

4              What about disciplinary reports for MSI

5    employees?  Do you keep those records?

6         A.   Let me think on this one.

7              We keep some personnel records for

8    reference, and there may be disciplinary in there, but

9    the ultimate personnel records are in the Personnel

10   Department for the City of St. Louis.

11        Q.   And that's outside of your scope of

12   knowledge?

13        A.   Correct.

14        Q.   Okay.

15        A.   But there are--there are--they do have some

16   personnel records with disciplinary information in

17   them.

18        Q.   Okay.  Do you--do you keep copies of the

19   current policies and procedures for the MSI?

20        A.   Um, the policies and procedures are for

21   both.  There's no specific one--

22        Q.   Okay.

23        A.   --for MSI.

24        Q.   And you keep those?

25        A.   I keep some, but I am not that person.  If I

1   need them, I have--I go to someone else.

2        Q.   Who do you go to for that?

3        A.   Michael Okpara.

4        Q.   Okay, and what is Michael Okpara's job?

5        A.   Policy and procedures.

6        Q.   Oh.  There's a whole--

7        A.   He--

8        Q.   --person for that?

9        A.   There's a whole person for that.

10       Q.   Okay, great.  Do you keep, separately,

11   housing inspections within MSI?

12       A.   Possibly, yes.

13       Q.   Okay.

14       A.   Within the Chief of Security.

15       Q.   What about security around law offices?

16       A.   Chief of Security.

17       Q.   Okay.  Temperature logs?

18       A.   Those might be separate, and we've turned

19   those over to Andrew.

20       Q.   And how did you--so you've--you have seen

21   temperature logs before then?

22       A.   Okay, yes.

23       Q.   Yes?  Okay.

24      A.   And we turned all of those over.

25      Q.   Okay, and so how did you collect all of

                                                    52

1    those?

2        A.   Actually, I didn't.

3        Q.   Okay.  So when you say "we" turned them

4    over, what do you mean?

5        A.   I mean the Division of Corrections turned

6    them over, and I was in the room with--when they were

7    turned over to Andrew.

8        Q.   Oh, okay.

9              (Plaintiff's Exhibit 3

10             marked for identification.)

11             I'm going to hand you what is marked

12   Exhibit 3.

13             Andrew, this, you'll see, has the file

14   stamp from the court.  It's Exhibit A to our First

15   Amended Complaint, as well.  It does not have a Bates

16   stamp.

17   BY MR. CARROLL:

18       Q.   (Continuing)  Have you seen this type

19   document before?

20       A.   I have not.

21      Q.    Okay, so this is a daily temperature report.

22      A.    Yes.

23      Q.    Do you know Major Tonya Harry, Chief of

24   Security?

25      A.    I do.

                                                        53


1       Q.    Do you know if Major Harry is in charge of

2    receiving temperature logs or daily temperature

3    reports?

4       A.    No.

5       Q.    Okay.

6       A.    She did these.

7       Q.    Okay.  Do you know who else was in charge of

8    gathering the temperature logs or temperature reports?

9       A.    I do not.

10      Q.    Okay, and other than inmate complaints,

11   which are separate now, that you gave to the City

12   Counselor's Office, is there anything else that was

13   not placed into the shipping container when you moved

14   them in June of 2018?

15          MR. WHEATON:  Object to form.  Subject to

16   that.  I just think it's vague.  I'm not quite sure

17   what you are asking, but subject to that, you can

18   answer if you understand the question.

19      A.   I don't know.

20   BY MR. CARROLL:

21      Q.   Okay, and I can rephrase, just——just to make

22   it clear.  So prior to June 2018, the 5 Charlie pod

23   had so many number of boxes in it,——

24      A.   (Nods head in affirmative manner).

25      Q.   ——and then in June of 2018, those boxes were

54

1   moved to a shipping container, and you withheld three

2   boxes of inmate complaints that you gave to the City

3   Counselor's Office.  Other than those three boxes,

4   were there any other documents that did not make it

5   into the shipping container that were in 5 Charlie?

6      A.   I previously stated that we kept things that

7   were still in retention.  I don't know——

8      Q.   Okay.

9      A.   ——what series those were, but my clerk was

10   told if it was in retention, to try to find a place

11   for it in the records room.

12      Q.   Okay, good.  So that's, that's helpful.

13      A.   But I will say, not everything that was

14   outside of retention——there were a few things that

15   went in that were still in retention.

16        Q.    Into the shipping container.

17        A.    Just a few things, but--

18        Q.    And so on, let's say, June 1st, 2018, your

19   retention would have been what, what year?  Or--

20        A.    Please, state that again.

21        Q.    So what was the--the retention period or the

22   cutoff date on June 1, 2018, for health?

23        A.    That would have been May 2013.

24        Q.    Okay, so--

25        A.    Or April two thou--if they went in in May,

                                                          55

1    it would have been April or May 2013.

2         Q.    Okay, so if I came to you and asked for, for

3    records that might fall under the Chief of Security

4    series that were after, let's say, 2013, you would

5    first look at your facility; correct?

6         A.    Correct.

7         Q.    Okay, and if you couldn't find them there,

8    then you'd have to look in the shipping container?

9         A.    Correct.

10        Q.    Okay, very good.  Thank you.  Do you know

11   if--do you know if the MSI creates or performs heat

12   audits that you would retain?

13        A.    I do not know.

14          Q.    Do you retain, in your office, copies of

15    environmental and safety rounds?

16          A.    If they come to me, I do, but I don't know.

17          Q.    Okay.  Do you--do you read every document

18    that comes to your office?

19          A.    I do not.

20          Q.    Okay, how do you know where to file a

21    document when it comes to your office?

22          A.    We break it down by where they came from.

23          Q.    Okay.

24          A.    So we break it down where does it come from;

25    Chief of Security.  Chief of the Security where?  MSI.

                                                          56


1     Okay.

2           Q.    Okay.

3           A.    Then we go through, okay, what date.  It

4     could be any date, with those records.

5           Q.    So do you get instruction from the people

6     who are submitting the records to you?

7           A.    No.

8           Q.    Okay, so it's up to you?

9           A.    It's just from going through the records, we

10    recognize they do it by date.

11      Q.   So you at least take a look at--a quick look

12   at what's in the box?

13      A.   Initially, I did--

14      Q.   Okay.

15      A.   --when I first started, but now, I've worked

16   with the records for that series.  They come in by

17   date.  They're stapled.

18      Q.   Okay.

19      A.   We just put them in a folder and write the

20   date on it.

21      Q.   And that's because it's faster that way?

22      A.   Yes.  If we need information, we go to that

23   date.

24      Q.   Okay, and you are keeping--are you keeping a

25   log of when these items come in, as well?

                                                    57


1       A.   I've been spotty on that.

2       Q.   Spotty?

3       A.   (Nods head in affirmative manner).

4       Q.   Okay.  Is that because it takes extra time,

5    too?

6       A.   No.

7       Q.   Okay.

8       A.   It's because sometimes, my days get really

9    busy.

10         Q.    Yeah.  Okay.

11              Do you--does anyone ever submit electronic

12   e-mail records of PDFs to you and say "Please print

13   this for the records"?

14         A.    No.

15         Q.    Or "Please save this"?

16         A.    No.

17         Q.    So you are not in charge of also keeping any

18   digital archive of documents?

19         A.    No.

20         Q.    Okay.

21         A.    Just--no.

22         Q.    Okay.  Do you know if records are kept--I

23   want to talk a little bit about inmate complaints.

24   When you found boxes of inmate complaints, you had to

25   organize them, correct?

                                                      58


1          A.    I had some light organization by file.

2          Q.    By file; okay.

3          A.    Not by document.

4          Q.    Okay, and are there--are there--I'll show

5    you this.  We'll mark this Exhibit 4.

6                    (Plaintiff's Exhibit 4

7                    marked for identification.)

8              So this Exhibit 4 begins at CODYETAL_5343

9    and goes all the way to a 5372 on the last page.  Do

10   you recognize this, this--looks like a folder depicted

11   here?

12             MR. WHEATON:  And just for the record, we've

13   agreed that these are confidential and subject--

14             MR. CARROLL:  Yes.

15             MR. WHEATON:  --to the protective order.  I

16   do not see a confidential marking on them, so I wanted

17   to make that clear for the record.

18             MR. CARROLL:  And we can go back and mark

19   them, but yes, so this is, like we talked about, this

20   protective order is in place to prevent confidential

21   inmate information from being disclosed, so this is

22   one of those documents, and we'll go ahead and state

23   on the record that they are confidential.

24        A.   I don't recognize this document.  I

25   recognize that it could come from that series.

                                                    59


1         Q.   Okay, and I'll represent to you this is one

2    that we--we sent some folks over to this office to

3    scan by phone these things, but the name on here looks

4    like it's--we'll just use the inmate, inmate number, I

5    think, 146388, and I believe all of these documents

6    were in a folder together, but there are a number of

7    different types of documents in here.  If you look on

8    the second page, which would be page 5344, this is a

9    handwritten note, it appears; correct?

10        A.    Okay.

11        Q.    At the bottom, there's a stamp that says,

12   "Received."  Do you know who puts that stamp on there?

13        A.    Whoever is doing CSU.

14        Q.    Okay, so this is--

15        A.    This is a CS--because these are the CSU

16   records.

17        Q.    So this, the "Received" stamp, is not from

18   your office?

19        A.    No.

20        Q.    Okay, so you are not receiving complaints

21   and processing them?

22        A.    I do not do that.

23        Q.    The only time you receive them is if they

24   are sent to you?

25        A.    When they're inactive.

```
 1      Q.    Inactive, so otherwise closed; correct?

 2      A.    (Nods head in affirmative manner).

 3      Q.    Okay.

 4      A.    Correct.

 5      Q.    And so you also don't know whose handwriting

 6  is at the bottom corner?

 7      A.    I do not.

 8      Q.    Okay.  That's fine.

 9            If you'd turn to the next page, that looks

10  like it comes from the CSU.  Have you ever seen this

11  form of document?

12      A.    Yes.

13      Q.    Okay.  Do you ever create this type of

14  document?

15      A.    I do not.

16      Q.    Okay.  You would only see it in the context

17  of receiving a CSU file, correct?

18      A.    As an inactive record.

19      Q.    Okay.  That's all on that.

20                  (Plaintiff's Exhibit 5

21                  marked for identification.)

22  BY MR. CARROLL:

23      Q.    All right, I'll hand you Exhibit 5.  This is

24  CODYETAL_3912 and 3913.  Have you ever seen this type

25  of record before?
```

```
 1      A.   Yes.

 2      Q.   What is this type of record?

 3      A.   It's an incident report that's been printed

 4  from IJMS.

 5      Q.   Do you use IJMS?

 6      A.   I do.

 7      Q.   You do?  How do you use IJMS?

 8      A.   I use it for records requests.

 9      Q.   Okay, can you describe to me an example of

10  how you would use that?

11           MR. WHEATON:  I've just want to make clear I

12  would consider IJMS would be to be under the heading

13  of 1-a.,--

14           MR. CARROLL:  Okay.

15           MR. WHEATON:  --so if she can answer these

16  questions as a fact witness--

17           MR. CARROLL:  Yeah, just--

18           MR. WHEATON:  --but not--

19           MR. CARROLL:  Yeah.

20           MR. WHEATON:  --speaking as a representative

21  of the City on this issue.

22           MR. CARROLL:  Okay.

23      A.   I, I use them to--when I get a subpoena on
```

24    an individual, I pull IJMS records, and it uses (sic)

25    me--it helps me to figure out what I'm being requested

                                                              62

1    and how to respond.

2    BY MR. CARROLL:

3         Q.    Okay, and so you could search their name?

4         A.    Correct, and inmate number.

5         Q.    Inmate number.  Is there any other way to

6    search if you don't have the name or inmate number?

7         A.    There is not.

8         Q.    Okay, so that's the most important piece,

9    name and inmate number?

10        A.    Correct.

11        Q.    Okay.  In your experience just working in

12   your position, not speaking on behalf of the City,

13   has--how long has this IJMS system been used by the

14   City?

15        A.    I believe it's November 2006.

16        Q.    Okay, so it predates your coming onboard?

17        A.    Yes.

18        Q.    Okay, good.

19               (Pause.)

20              MR. CARROLL:  I think we'll take a quick

21  break and then try to wrap up for you,--

22          THE WITNESS:  Okay.

23          MR. CARROLL:  --get you home.  Thank you.

24          (Recess.)

25          MR. CARROLL:  Okay, we're back on the

                                              63


1   record.  We'll try to finish up pretty quickly, here.

2           You told us about the amount of time it took

3   to move the boxes from the 5 Charlie unit in CJC to

4   the shipping container at MSI.  Can you, based on that

5   experience, can you estimate how long it would take to

6   sort out the shipping container into boxes that only

7   contain MSI information?

8       A.   Um, I cannot begin, because it would depend

9   on who was doing the work, and it would depend on the

10  resources that I had, and it would depend on the time

11  of year, even, so I--it would take months.

12      Q.   Okay.

13      A.   I would say at last two or three months,--

14      Q.   Okay.

15      A.   --easily.

16      Q.   So that you could know for sure--

17      A.   Yes.

18      Q.   --all of these documents are CJC, but all

19    those boxes are MSI?

20         A.   Yes, it would take a very long time.

21         Q.   Okay, and again, the shipping containers is

22    not the ideal place to keep them; is that correct?

23         A.   That is correct.

24              MR. CARROLL:  Okay.

25              MR. WHEATON:  On that point, this is not

                                                        64

1     within the scope of the 30(b)(6) notice.  Everybody

2     has their opinion, you know, speaks out, isn't a

3     representative of the City on that point.

4               MR. CARROLL:  Okay.

5     BY MR. CARROLL:

6          Q.   You mentioned earlier that records are

7     currently being placed in the MSI in a--in the

8     Maintenance office--

9          A.   Yes.

10         Q.   --in a corner or in a pile, you said?

11         A.   Yes.

12         Q.   Who is in charge of that stack of documents?

13         A.   Technically, I am.  As the records manager,

14    as the custodian of records, Records Retention

15    Supervisor, technically, it's me, but I'm asking for a

16    place to go with it.

17         Q.   Okay, so at any given time, if you are not

18    at MSI, is there anyone that has--that's sort of

19    backing you up for control of those documents?

20              MR. WHEATON:  Object to form.

21              MR. CARROLL:  Okay.

22              MR. WHEATON:  Subject to that, you can

23    answer.

24         A.   I don't know.

25    BY MR. CARROLL:

                                                    65


1          Q.   Okay, and do you have a way of knowing what

2     types of documents are in that stack?

3          A.   Yes.  The type of documents from MSI would

4     be Chief of Security, possibly Maintenance if they

5     decide to put their own stuff there, Social Services,

6     and their payroll office.

7          Q.   Okay, and all of those different categories

8     you just listed, or different sources, those are--is

9     it--are those different series?

10         A.   (Nods head in affirmative manner)   Records

11    series, correct.

12         Q.   Do you have a list of the different units,

13    and series, and subseries for just records that you

14  keep?

15      A.   I keep it in my head.

16      Q.   In your head?

17      A.   (Nods head in affirmative manner).

18      Q.   Okay.

19      A.   I would have to work it out.

20      Q.   Okay.  We may need--we may send a, just a

21  written request to do that, so you don't have to try

22  to guess now, because we just want to know--

23      A.   It breaks down by the sections, and then it

24  would--that's pretty much how it would go, but yeah,

25  we could work that out.  It wouldn't take long.


                                              66


1       Q.   Okay, good, and you wouldn't mind doing that

2   for us sometime?

3       A.   No.

4       Q.   Okay.

5       A.   That's very easy to do.

6       Q.   And then another term that you mentioned was

7   inactive records.

8       A.   Correct.

9       Q.   Is that a term that you use just to describe

10  CSU-type of files?

11          A.    It's a term I use to describe all records.

12          Q.    Okay, so what makes a record inactive?

13          A.    No longer needed.

14          Q.    And that could be because the matter is

15  resolved?

16          A.    Possibly.

17          Q.    And it could be because it's outside of the

18  retention period?

19          A.    No.

20          Q.    Okay.

21          A.    Retention is separate.

22          Q.    Okay.

23          A.    Inactive means you are not using it anymore.

24          Q.    Okay, and so when documents come to your

25  office, are they inactive?

                                                        67


1           A.    Yes.

2           Q.    Okay.

3           A.    That's what I tell people, "Are these

4   inactive records?  I'm not your file clerk."

5           Q.    That's a good thing to tell, tell people.

6   Okay.

7                 To your knowledge, are any active--did any

8   active records get placed in the shipping container?

9      A.   No active records were placed in the

10   shipping container.

11      Q.   If there were any active records, they would

12   be in your facility at CJC or--

13      A.   It would be with the records creators.

14      Q.   That makes sense.  Thank you.  Thank you for

15   clarifying that.

16           Do you know if there are records about

17   inmate, inmate programming?  Like Social--is that

18   Social Services?

19      A.   Social Service records, and we have a

20   program coordinator.

21      Q.   Okay, what's that person's name?

22      A.   Robin Edwards.

23      Q.   Okay.

24      A.   And that's actually on the City website.

25      Q.   Yeah.

                                              68


1      A.   It's on our website.  If you look at the

2   Corrections website--I saw it just today--it's all

3   there.

4      Q.   Okay, good.  Well, I won't ask you to go

5   through the whole website.

 6            Is the name of the person who might be able

 7    to talk about the topic 1-a., the electronically

 8    stored information, is that person named on the

 9    website, too?

10        A.   No, but that would be under Robin Edwards,

11    as well.

12        Q.   Okay, and that would be--so Robin Edwards is

13    the person that if you had questions about technology

14    used at MSI for keeping records, you would ask Robin?

15        A.   Yes, and she might direct one of her staff

16    to answer me, but Robin is over that section.

17        Q.   Robin; okay.  Do you keep any audio

18    recordings or video recordings, either on cassette, or

19    CD, or other physical format, at your office?

20        A.   We have some audio, but I don't know what

21    they are.  I don't have the medium to play them.

22        Q.   Okay.  Okay, and do you know what form?

23    Like, how is that audio kept?  Is it on a tape?

24        A.   Yeah, little tapes.

25        Q.   Okay.

                                                      69


 1        A.   I have bags of them.

 2        Q.   Bags of tapes?

 3        A.   (Nods head in affirmative manner).

4          Q.    Okay, and do you know where those bags of

5     tapes came from?

6          A.    (Shakes head in negative manner.)

7          Q.    Okay.

8          A.    I do not.

9          Q.    Okay.

10         A.    They came in a box.

11         Q.    Okay, from MSI?

12         A.    I don't know where they came from.

13         Q.    Okay, but you don't regularly archive or

14    keep copies of videotapes or surveillance footage, to

15    your knowledge?

16         A.    I do not.

17         Q.    Okay.  When the--when documents are outside

18    of the retention period and you are ready to shred

19    them, what is that process like?

20         A.    The State statute requires that we have

21    secure shredding.  We have--the City has a contract

22    with a shredding company, Pro Shred.  They come to our

23    facility, we put the records that I say are outside of

24    retention into a gray tub, one of the gray shredding

25    bins, and then I stand there and watch as they put

                                                        70

1    them in the shredder, and I watch on a little screen

2    that they get shredded.

3          Q.    With a video feed inside the shredder?

4          A.    Yes.

5          Q.    Okay.

6          A.    It's very important, because the State

7    statute requires that I watch, that I know they've

8    been shredded.

9          Q.    That's good, very good, and prior, prior to

10   shredding documents, you have to keep your documents

11   that you are retaining locked up, as well; correct?

12         A.    Yes.

13         Q.    Okay, and that includes the documents in the

14   shipping container; yes?

15         A.    Yes, and that's why 5 Charlie has the

16   locking door.

17         Q.    Okay.  That makes sense.

18         A.    My records are locking door; my office,

19   locking door.

20         Q.    Does anyone besides you have a key to the

21   shipping container?

22         A.    It's in a key box.

23         Q.    In a key box?

24         A.    That I have to have access to.

25         Q.    Does anyone else have access to that?

1      A.    I would assume Superintendent Carson.

2      Q.    Okay, and then do you keep records of

3   invoices that are paid to third-party contractors for

4   maintenance?

5      A.    Those have been turned over to me by the

6   Business Office.

7      Q.    Okay, so Business Office processes them, and

8   then they might come to you?

9      A.    After a certain time--after they become

10  inactive.

11     Q.    Okay.  Okay.

12     A.    If they're active, they stay there.

13     Q.    Okay.  Do you know if there are Internal

14  Affairs records that are kept by MSI?

15     A.    Yes.

16     Q.    Okay, do you know what category or series

17  those would be listed in?

18     A.    Internal Affairs.

19     Q.    So there's a separate series for Internal

20  Affairs?

21     A.    Yes.

22     Q.    Okay, and is it sorted--is it separated or

23  organized by facility, MSI or CJC, or is it

24    all together?

25         A.    I try to sort them by MSI, CJC, try to do

72

1    that with everything, but sometimes, some cases may

2    come over to us, depending on the facility,--

3         Q.    Okay.

4         A.    --depending on the situation--it's

5    situational; that's what I should say.

6         Q.    Does the five-year retention policy apply to

7    Internal Affairs records, as well?

8         A.    Yes, they do.

9         Q.    Are there any records that fall outside of

10    that five-year retention policy?

11         A.    Medical records.  It's ten years.

12         Q.    Ten years for medical records?

13         A.    By health, and--what is it?  Hospitals and

14    Health Department retention is ten years.

15         Q.    Okay, and in your experience, has anyone

16    ever asked you to destroy records before the five-year

17    retention period--

18         A.    No.

19         Q.    --has lapsed?

20         A.    No.

21      Q.   Good.  Are there any Internal Affairs

22  records in the shipping container for MSI?

23      A.   I don't think so, but I'm not a hundred

24  percent—

25      Q.   Okay.

73

1      A.   I don't think I would have put them in

2  there.

3      Q.   Okay, where do you think they might be?

4      A.   I have some for CJC in my office, and I have

5  never received any from MSI.

6      Q.   Okay, and that's since you have begun

7  working there in 2013?

8      A.   I've never received Internal Affairs records

9  from MSI.

10      MR. CARROLL:  Okay.  I think that's it.

11  Thank you, so much, for your time today and for

12  walking us through your everyday job and your task at

13  putting things in the shipping container.

14      You have the option to read the transcript

15  that our court reporter has prepared and make sure

16  that he spelled everything right and got it all.  You

17  can't change your testimony, or you can waive

18  signature and trust that he got it right.  It's up to

19   you.

20          MR. WHEATON:  I typically recommend that

21   people waive signature.

22          THE WITNESS:  Okay, whatever you say.

23          MR. CARROLL:  Okay.

24          MR. WHEATON:  She'll waive.

25          MR. CARROLL:  Great, and let's make sure

                                                    74


1   that--I don't think you took any of the documents that

2   we marked as exhibits.

3          THE WITNESS:  I did not.

4                 (Thereupon, at 2:39 P.M., the

5                 deposition was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

75

1   State of Missouri.        )

2                             ) SS.

3   City of St. Louis         )

4              I, J. Bryan Jordan, a Certified Court

5   Reporter in and for the State of Missouri, duly

6   commissioned, qualified and authorized to administer

7   oaths and to certify to depositions, do hereby certify

8   that pursuant to Notice in the civil cause now pending

9   and undetermined in the United States District Court

10  for the Eastern District of Missouri, Eastern

11  Division, to be used in the hearing of said cause

12  before said court, I was attended at the offices of

13  St. Louis City Hall, 1200 Market Street in the City of

14    St. Louis, State of Missouri, by the aforesaid witness

15    and by the aforesaid attorneys, on the 14th day of

16    August, 2018.

17              The said witness, being of sound mind

18    and being by me first carefully examined and duly

19    cautioned and sworn to testify the truth, the whole

20    truth, and nothing but the truth in the case

21    aforesaid, thereupon testified as is shown in the

22    foregoing transcript, said testimony being by me

23    reported in shorthand and caused to be transcribed

24    into typewriting, and that the foregoing pages

25    correctly set forth the testimony of the

76

1    aforementioned witness, together with the questions

2    propounded by counsel and remarks and objections of

3    counsel thereto, and is in all respects a full, true,

4    correct and complete transcript of the questions

5    propounded to and the answers given by said witness;

6    that signature of the deponent was waived by agreement

7    of counsel.

8              I further certify that I am not of

9    counsel or attorney for either of the parties to said

10    suit, not related to nor interested in any of the

11    parties or their attorneys.

12                    Witness my hand and official seal at

13    St. Louis, Missouri, this 17th day of August, 2018.

14

15

16

17

18

19                         <%16517,Signature%>

20                         J. Bryan Jordan

21                    Certified Court Reporter

22                    State of Missouri No. 532

23

24

25