**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES CODY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 4:17-cv-2707-AGF |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE
OPINIONS, TESTIMONY, AND REPORTS OF DEFENDANT'S PROPOSED EXPERT
WITNESSES GEORGE HARDINGER AND JOSEPH GUNJA**

**INTRODUCTION**

This Court should exclude the opinions, testimony, and reports of Defendant City of St. Louis's (the "City") experts, George Hardinger and Joseph Gunja, because they are inadmissible under Federal Rule of Evidence 702 (hereinafter, "Rule 702"), as well as *Daubert v. Merrell Dow Pharm. Inc*., 509 U.S. 579, 589 (1993).

This long-running civil rights class action brings conditions of confinement and unlawful retaliation claims against the City under 42 U.S.C. § 1983.  (*See* ECF No. 22.)  Discovery in this case has now closed, and Messrs. Hardinger and Gunja have tendered their reports and been deposed.  Their depositions confirm what their inadequate reports suggested—that neither's testimony is admissible under the Rule 702 or *Daubert.*

Messrs. Hardinger's and Gunja's opinions, testimony, and reports (hereinafter "testimony") suffer two fatal flaws.  ***First,*** the two fail to link their conclusions to *any* applicable professional standards or *any* practical experience gained over the course of their respective careers.  (*See infra,* § I.)  For this reason, it is impossible to determine whether either's testimony

1

"is the product of reliable principles and methods" or either "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). Rather, Messrs. Hardinger and Gunja ask to be taken at their word, offering conclusions unmoored to any objective standards or experience, and, as a result, bereft of any meaningful analysis. For this reason alone, both Gunja's and Hardinger's testimony, reports, and opinions should be excluded. *Second,* Messrs. Hardinger and Gunja both flatly ignore relevant facts of the case, leaving their opinions unsupported by sufficient facts and, as such, unduly speculative, which again runs afoul of both Rule 702 and the case law interpreting it.  (*See infra,* § II.)

These deficiencies are sufficient to exclude the City's expert's testimony in full.  But should the Court decline to exclude such testimony in its entirety, further shortcomings in both reports warrant the Court, at minimum, circumscribing such testimony.  In short, (1) portions of Mr. Hardinger's testimony opine on the ultimate legal issue (*see infra,* § III); and (2) portions of both Messrs. Hardinger's and Gunja's testimony are based on insufficient facts and data.  (*See infra,* § IV.)

All the foregoing is legally impermissible, and Messrs. Hardinger's and Gunja's testimony, reports, and opinions should therefore be excluded in their entirety, or, at minimum, in relevant part.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 governs whether expert testimony is admissible:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and,

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under *Daubert*, the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597; *see also United States v. Merrell*, 842 F.3d 577, 582 (8th Cir. 2016) ("In the case of all expert testimony[,] the district court serves as a gatekeeper to ensure that only reliable and relevant expert testimony is presented to a jury."); *Cole v. Homier Distrib. Co., Inc*., 599 F.3d 856, 865 (8th Cir. 2010) ("Expert testimony is admissible if it is reliable and will help the jury understand the evidence or decide a fact in issue.").

When courts apply Rule 702, they consider a number of nonexclusive and non-dispositive factors, including whether the expert's theory has been tested or subjected to peer review, whether the theory is generally accepted, and whether the expert has properly applied the theory to the facts of the case.  *See Daubert*, 509 U.S. at 592.  But *Daubert*'s factors "are neither exhaustive nor are to be painstakingly applied in all cases involving expert testimony;" rather, "the Court's inquiry is a flexible one and must be 'tied to the facts of [the] particular case.'"  *Mouser v. Caterpillar, Inc*., No. 4:98-CV7-44-FRB, 2000 WL 35552637, at *7 (E.D. Mo. Oct. 6, 2000) (internal citation omitted).

The Court is vested with broad discretion to determine the usefulness and reliability of expert testimony.  *See Jaurequi v.  Carter Mfg.  Co., Inc.*, 173 F.3d 1076, 1081 (8th Cir. 1999) (noting how "'[d]ecisions concerning the admission of expert testimony lie within the broad discretion of the trial court'" (internal citation omitted)); *UnitedHealth Grp.  Inc.  v.  Exec.  Risk Specialty Ins. Co*., 870 F.3d 856, 864–65 (8th Cir. 2017) (affirming district court's disqualification of legal antitrust expert's testimony under Rule 702 concerning "value of the antitrust claims

3

asserted" where such expert did not analyze the underlying lawsuit and thus "could not provide an expert opinion about its value").  But trial judges must also take their "gatekeeping" function seriously in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Synergetics, Inc. v. Hurst*, 477 F.3d 949,955 (8th Cir. 2007) (quoting *Daubert*, 509 U.S. at 589).

## ARGUMENT

**I.  Messrs. Hardinger's and Gunja's Testimony Should Be Excluded Under Rule 702(b) Because They Are Not the Product of Reliable Principles and Methods**

An expert "must . . . explain how he reaches his conclusions—either by [1] linking them to generally accepted standards in the field or [2] by citing information within his own practical experience." *Andersen v. City of Chicago*, 454 F.Supp.3d 808, 814 (N.D. Ill. 2020) (citing *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered...."); *Potts v. Manos*, No. 11 C 3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard for reliability under *Daubert* and the Federal Rules of Evidence.")).

Messrs. Hardinger and Gunja do neither, and for that reason, their testimony must be excluded.

### A.  The City's Purported Experts Disregarded Generally Accepted Standards.

"[A]n expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment."  *United States v. Richter*, 796 F.3d 1173, 1195–96 (10th Cir. 2015) (internal quotation marks and citations omitted).  This means that, where an expert's "report

4

fails to adequately articulate or specify what the acceptable industry standards are," a court should strike such expert's report and testimony. *Novotny v. Weatherford Int'l, LLC*, No. 1:16-CV-260, 2017 WL 5987826, at *5, 6 (D.N.D. Oct. 25, 2017). This occurs routinely. *See Haynes v. Transamerica Corp.,* No. 16-CV-02934-KLM, 2018 WL 4360444, at *3 (D. Colo. Sept. 13, 2018) (excluding testimony where expert "state[d] that [opposing party] acted 'contrary to applicable standards" but "d[id] not identify or explain the 'applicable standards' or how he analyzed the facts of the case in light of those standards"); *O'Brien v. Travelers Prop. Cas. Co. of Am.*, No. CIV-16-1176-HE, 2018 WL 8335138, at *3 (W.D. Okla. Jan. 29, 2018) (excluding testimony in part where expert "report d[id] not identify applicable industry standards in a meaningful way" because "[s]imply reciting that a particular practice does not meet industry standards, without even a minimal effort to identify or articulate what the standard is, is insufficient")*; DiBiasi v. Starbucks Corp.,* No. CV-07-276-LRS, 2009 WL 10704419, at *2 (E.D. Wash. May 22, 2009) (excluding testimony where expert's declarations "refer[red] to 'generally accepted standards' and 'recognized national standards' without identifying what those particular standards [we]re and how they support[ed] his opinions" and noting "such standards should have been identified in [his] expert report, and certainly no later than at his deposition").

Here, Mr. Hardinger's report concludes "that . . . *the prevailing standard of care* for the safe, secure and humane operations of a secure local adult correctional facility [was satisfied at MSI];" and that "the conditions at [] MSI [are] . . . operationally consistent with and in compliance with *the applicable professional standards* . . . for operating a secure adult pre-trial detention facility or institution." (Exhibit 1, Hardinger Rep't, at pp. 2, 4 (emphases added).) The fundamental flaw is that it is entirely unclear to what standards Mr. Hardinger is referring. Mr. Hardinger makes a passing reference to "the City . . . endeavor[ing] to comply with the applicable

Standards of the American Correctional Association ['ACA'] and the National Commission of Correctional Health Care (NCCHC)."  (*Id*. at p. 2.)  But Mr. Hardinger never states **which of these hundreds** of ACA and NCCHC standards are "the applicable" standards, failing to provide the names, subsections, or contents of any such policies.  (*See generally id.*)[1]  Confusingly, Mr. Hardinger also flatly contradicted his report during his deposition when he opined that the ACA **does not** apply to MSI:

> A. [T]he facility is not under ACA accreditation requirements. Those standards, those policies and procedures, are not applicable  . . .
>
> Q. I'm sorry. I missed that. What standards?
>
> A. Those standards that applied to the facility.
>
> Q. And what would those be?
>
> A. So ACA can be ruled out, for example.

(Exhibit 2, Hardinger Dep., at pp. 83:1-3; 85:18-19.)[2]  This flaw recurs elsewhere in Mr. Hardinger's report.  At one point, Mr. Hardinger concludes that "MSI was not overcrowded, the staffing levels [were] adequate[,] and the environmental conditions were apparently compliant **with the applicable health and safety codes**."  (Ex. 1, Hardinger Rep't, at p. 4 (emphasis added).)  But, again, Mr. Hardinger's report and testimony do not identify the "health and safety codes" to which he is referring.  (*See generally id.*).[3]

---

[1]  Likewise, Mr. Hardinger's list of documents reviewed includes two standards—the "American Correctional Association, Guidelines for The Development of Policies and Procedures, Adult Detention Facilities" and "American Correctional Association, Standards for Adult Correctional Institutions, 4th Edition"—but here, again, he fails to cite or discuss any specific subsections that applied to or were followed by MSI.  (Ex. 1, Hardinger Rep't, at p. 10).

[2]  The ACA, does, in fact apply.  *See, e.g.,* Exhibit 3, *City of St. Louis Department of Public Safety / Division of Corrections, POLICY & PROCEDURES, Ch. 2.3.1, Environmental Conditions*, CITY 0006425 (noting policies expressly incorporate ACA standards).

[3]  In addition, during his deposition Mr. Hardinger conceded that he did not look into **any** state-specific standards in preparing his report (Ex. 2, Hardinger Dep., at pp. 31:20-32:9), or evaluate

Mr. Hardinger more clearly states the standards upon which he *did not* rely in rendering his report.  During his deposition, Mr. Hardinger admitted he ***did not*** rely upon any standards from (1) the National Institute of Corrections ("NIC") (*id.* at p. 128:8-13); (2) the American Public Health Association ("APHA")[4] (*id.* at p. 128:14-18), or (3) the American Society of Heating, Refrigerating & Air Conditioning Engineers ("ASHRAE") (*id.* at pp. 131:22-25).  Mr. Hardinger also conceded that he did not examine any standards regarding whether MSI detainee living conditions were habitable (*id.* at p. 133:9-15), despite clearly opining on this topic.  *See* Ex. 1, Hardinger Rep't, at p. 5 ("While the 'dorms' are presently vacant, ***the improvements cannot be ignored in relationship to the conditions of the male detainees' living conditions*** - especially if it becomes necessary to 'open' one or more of the dorms." (emphasis added)).[5]  Because Mr. Hardinger failed to articulate any discernible standard upon which his opinions regarding MSI's conditions are based, his testimony should be prohibited from presentation at trial.

Mr. Gunja fares no better.  Like Mr. Hardinger, Mr. Gunja makes only a general reference to the ACA: "I did not find any policy to be inadequate and/or not in accordance with good standard practice or American Correctional Associate [sic] (ACA) standards."  (Exhibit 4, Gunja Rep't, at p. 6.)  Beyond that, however, Gunja fails to provide the names, subsections, or contents of any such policies when drawing his conclusions:

> The policy on use of force fully meets ***applicable standards*** on use of force protocols . . . My review of inmate complaints for medical and health care found that are ***normal for any correctional facility*** . . . [MSI] w[as] not housing inmates in housing

---

conditions at MSI with respect to the FDA national food code (*id.* at p. 130:17-22), or any particular fire codes.  (*Id.* at p. 83:9-16.)

4   At least with respect to core correctional institutions, with which Mr. Hardinger was unfamiliar.

5   *See also id*. at 109:15-113:16, 116:11-118:15 (describing that Mr. Hardinger did not evaluate any specific industry or regulatory standards and instead evaluated undefined "court-established standards of care.").

units which were not suitable to habitation . . .  The plaintiffs allege violence and retaliation by staff in their complaint. I did not find any specific proof of these allegations, and any allegations lacked appropriate support and were not substantiated, *in my professional opinion*. This was based on depositions and other documents reviewed.

(*Id.* at pp. 6-7 (emphasis added).)  This is curious, given that Mr. Gunja confirmed during his deposition that his methodology consisted of analyzing MSI policies in light of generally accepted correctional standards.  (*See* Exhibit 5, Gunja Dep., at p. 127:4-11).  Yet, when pressed to identify where in his report he applied (or even referenced) these generally accepted correctional standards, he could not identify a single instance:

> Q. Well, where in your report do you apply any specific written correctional industry standards to the conditions at MSI?
>
> A. ***I don't believe I specifically referenced any*** -- the specific areas, but I was able to validate what I know is a required practice in a jail in my report …
>
> [Q.] Can you direct me to one instance of where you cite to a specific written standard in the -- in the correctional field and apply that specific standard to the conditions at MSI?
>
> A. ***No, I don't have a specific [instance]***, but their own policies identify that. That's why I wrote it that way.
>
> [Q.] I'm looking for a place in your report . . . where you apply specific generally accepted written standards in the correctional field to the conditions at MSI, . . . not general sort of conclusions, but specific written standards. Is there anywhere in your report that you do that? . . .
>
> [A.] There's specific areas.  It's all over my report . . . ***But if you're asking me specific policy or specific ACA standards, no, I don't have that identified in my report.***

(*Id.* at pp. 127:23-128:4; 129:6-13; 128:21-129:5; 129:24-130:1 (emphases added).)

Instead, Mr. Gunja says it is enough that he "identif[ied] [that] every correctional facility should have a system for use of force when deemed appropriate, follow-up review procedures, and correction action steps," and noted that "MSI had all these in place upon [his] review," all of which, according to him, complied with the ACA.  (*Id.* at pp. 130:20-131:2.)  But this is meaningless since

8

both his report and deposition are silent *as to what the ACA actually requires* about (1) the proper criteria for determining when use of force is "deemed appropriate;" (2) what appropriate "follow-up review procedures" look like in practice; or (3) what "correction[al] action steps" actually entail.

Where conditions of confinement experts fail to cite any specific standards, courts routinely exclude their testimony as inadmissible. *Cox v. Glanz*, No. 11–CV–457–JED–FHM, 2014 WL 916644 (N.D. Okla. Mar. 10, 2014), is squarely on point and instructive. In *Cox*, the court roundly rejected a corrections expert's testimony about "whether defendant's conduct was proper and in compliance with jail policies and procedures" because "none of his opinions . . . refer[red] to any particular policies or procedures and, other than generically listing 'policies' in a list of items that he reviewed . . . [and] his report d[id] not identify which policies and procedures he alleges were followed or were material." *Id.* at *3 (citations omitted).[6] Mr. Gunja's testimony and report suffer

---

[6] Numerous district courts have reached the same conclusion as *Cox* on similar fact patterns. *See, e.g., Robles v. United States*, No.: 2:19-cv-111, 2020 WL 6533651, at * 3-4 (E.D. Va. Aug. 13, 2020) ("[An expert]'s mere 'say so' that Defendant's conduct violated 'the industry standard' does not constitute a reliable opinion . . . [The expert] never actually discusse[d] what the industry standard specifically [wa]s with respect to the proper way to supervise [employees undertaking a particular task]. Citations to the various authorities generally such as [c]ode[s] . . . , [industry] publication[s] . . . or . . . company handbook[s], *without specifically describing the provisions that purportedly establish the industry standard*, [are] wholly insufficient to establish the standard of care.") (emphasis added); *Bloom v. Toliver*, No. 12–CV–169–JED–FHM, 2015 WL 12745090, at *2, 3 (N.D. Okla. Sept. 23, 2015) (finding expert's "opinion [wa]s unconnected to any identifiable standards and merely state[d] a factual determination that appears solely supported by the *ipse dixit* of [expert], *based upon mostly unspecified documents that he reviewed*"; and that additional opinion "[did] not explain *what specific corrections standards or experience* constitute[d] the foundation for his opinion") (emphases added); *Cunningham v. Arizona*, 2013 WL 3335190, No. CV 12–00313–PHX–FJM, at *2 (D. Ariz. July 2, 2013) (noting expert "may testify as to whether he believes defendants' actions were reasonable based on objective national standards for correctional mental health services, but *any testimony that is based on nothing more than his personal views will be excluded*") (emphasis added).

from ***precisely*** the same fatal flaw that compelled exclusion of the expert report and testimony in *Cox*.

**B.  <u>The City's Experts Do Not Reliably Apply Their Experiences to the Facts.</u>**

"If [an expert] witness is relying solely or primarily on experience, then the witness must explain ***how*** that experience leads to the conclusion reached, ***why*** that experience is a sufficient basis for the opinion, and ***how*** that experience is reliably applied to the facts."  Fed. R. Evid. 702, advisory committee's note to the 2000 amendment (emphases added).  Where an expert "does not explain . . . what in his experience led him to believe [a certain conclusion]" and "merely jumps to the conclusion without explanation," his opinion should be excluded under Rule 702.  *Andersen,* 454 F.Supp.3d at 817.  In *Dukes v. Georgia*, the court excluded an expert's testimony on grounds that:

> Except for (i) [a single] . . . sentence which provide[d] '[w]ith my experience in correctional health care for more than 16 years, my opinions are to a reasonable degree of medical certainty and based on standards of care for correctional facilities such as the Coweta County Jail,' and (ii) a general listing of [the expert's] background experience in health care, [the expert] ma[d]e[] no reference to any specific experience or material upon which he relied in making his conclusions.

428 F. Supp. 2d at 1314-15.  And in *Andersen v. City of Chicago*, where an expert "simply stated, without elaborating, that based on his experience . . . the knife should have been handled [in a particular way]," the court made clear that "[t]his is not a reliable methodology to reach such a conclusion," and similarly excluded the expert's opinion.  454 F.Supp.3d at 817 (citation omitted).

Yet again, this is precisely what Messrs. Hardinger and Gunja do.  Mr. Hardinger offers no specific explanation of ***how*** he applied any ***particular*** experience of his to the facts, ***how*** such an application led him to his conclusion, nor ***why*** such experience is a sufficient basis for such a

conclusion.[7]  *Compare Cox,* 2014 WL 916644, at *3 (excluding report of expert who "d[id] not

indicate what ***specific*** experience he has that would be relevant to Jail practices [he opines upon]";

"d[id] not set forth any ***particular*** knowledge, experience or training that makes him qualified to

draw that conclusion under the facts presented in this case"; and "d[id] not explain the ***process by***

***which he relates his experience to the facts at hand in order to reach that opinion***") (emphases

added).  Instead, like the *Dukes* expert, Mr. Hardinger only invokes his professional background

in passing:

> I am prepared to testify in support of these findings **which are based solely on** the
> factual documents provided in discovery, my site visit, and ***my experience and***
> ***expertise in the field of correctional practices, operations, and management***.

(Ex. 1, Hardinger Rep't, at pp. 1-2 (emphasis added).)  And Mr. Hardinger relates the "specifics"

of his experience only as boilerplate biography, *i.e.* through "a general listing of [his] background

experience," 428 F. Supp. 2d at 1315,—in the same, unacceptable manner as the *Dukes* expert.

(*See* Ex. 1, Hardinger Rep't, at pp. 10-12.)   Mr. Hardinger's discussion of his experience is thus

entirely unmoored to any of his conclusions.  (*See, e.g., id.* at p. 4 (concluding "housing units were

adequately staffed" but citing no experience upon which to base his opinions); *id.* at p.10

(concluding "record establishes that Correctional Officers and other staff are properly trained and

certified to perform their official duties" but citing no experience upon which to compare the

record and base his opinion).)[8]  This may be because Mr. Hardinger's experience does not render

---

[7]   In fact, Mr. Hardinger's report makes clear the basis for his opinion is not his particular
experience, but rather his purported review of industry standards. (*See* Ex. 1, Hardinger Rep't,
at p. 2.)

[8]   Not only that, but, in the next sentence, Mr. Hardinger seemingly implies there is ***not*** currently
sufficient documentation to demonstrate MSI complies with ACA standards.  (*Id.* at p.11 ("As
MSI works to be accredited by the ACA the documentation ***will be there*** to support that the
MSI complies with the required standard of care and professional best practices for managing

him competent to testify to a number of issues on which he offers ultimate opinions.  Though he maintains that "those lawfully detained at MSI were confined in an environment that protects detainees from serious harm" and "inhumane conditions" (Ex. 1, Hardinger Rep't at p. 2), Mr. Hardinger himself admitted during his deposition that he could not testify to the potential ***effects*** of myriad conditions, including pest infestations (Ex. 2, Hardinger Dep., at p. 121:7-10), extreme temperatures (*id.* at p. 121:12-14), mold (*id.* at 121:15-22), and exposure to unsanitary conditions, such as standing water or fecal matter.  (*Id.* at pp. 121:23-122:21).

For his part, Mr. Gunja recounts his experience in largely the same manner, relating none of the "how" and "why" required of an expert when using his personal experience as a basis to render an opinion.  *See, e.g.,* Ex. 4, Gunja Rep't, at p. 6 (noting that "[i]t is . . . apparent that maintenance issues have consistently been addressed in a manner consistent with correctional standards and best practices, ***based on my experiences working in the Federal Bureau of Prisons***" but declining to provide any detail on such experience) (emphasis added). Worse yet, elsewhere in his report, Mr. Gunja does not even bother invoking his personal experience before reaching a conclusion, which leaves this Court (and a jury) entirely unable to assess the reliability of his opinions (examples below, deficiencies in brackets):

> My review of inmate complaints for medical and health care found that are normal for any correctional facility [Why, on what basis?] . . .

> Sometimes inmates make claims which must be interpreted the same way people in communities receive medical care, such as triage oriented, scheduled for later care, etc. [Why, on what basis?] . . .

> [S]ome of the dormitories and secure housing units . . . were not housing inmates in housing units which were not suitable to habitation.  [Under what standard is habitability judged?] . . .

---

and operating a secure adult correctional institution that houses pre-trial detainees." (emphasis added).)

I did not find any specific proof of these allegations [of violence and retaliation], and any allegations lacked appropriate support and were not substantiated, in my professional opinion. [What constitutes support and substantiation in a correctional context?] . . .

the operational security is sound and I did not find any deficiencies with the way the facility is managed day-to-day [Based on what?] . . .

ln addition, I did not find any areas where inmates were housed or utilized program areas that were harmful or hazardous [Based on what?] . . .

(*Id.* at pp. 6-7.)

None of the above satisfies Rule 702, and Messrs. Hardinger's and Gunja's testimony should therefore be excluded on this basis alone.

### C.  The City's Experts Fail to Apply Any Discernible or Reliable Methodology.

Finally, whether rendering an opinion based either upon industry standards or personal experience, "[a]n expert's opinions are properly excluded when the court is only presented with an expert's qualifications, conclusions, and assurances of reliability," since *Daubert* tests "not the correctness of the expert's conclusions but the soundness of his methodology," and thus "[t]he court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Ocampo v. Corizon*, No. 20-35990, 2021 WL 1256572, at *37-38 (9th Cir. 2021) (citations omitted); *see also* Fed. R. Evid. 702, advisory committee's note to the 2000 amendment.  Where an expert "[provides] no summary of any principles or methods he applied," and his report "does not explain how he arrived at his conclusions, other than that he reviewed documents and determined the staff did nothing wrong" and does not "contain any explanation of how his experience applies to arrive at his conclusions," that report should be excluded.  *Cox,* 2014 WL 916644, at *3.

Thus, regardless of Messrs. Hardinger and Gunja allusions to industry standards or practical experience in rendering their opinion, their failure to describe any discernible

methodology they applied disqualifies their opinions.  Neither's report contains a summary of principles and methods nor explains *how* they arrived at their conclusions.  (*see generally* Ex. 1, Hardinger Rep't, Ex. 4, Gunja Rep't).  Instead, both experts merely state that they reviewed documents and determined that the conditions in the facility were acceptable.  *See, e.g.* Ex. 1, Hardinger Rep't, at p. 7 (stating that "[t]he record does not support such complaints as medical treatment was provided as deemed appropriate," without any record citation or provided basis for medical analysis); Ex. 4, Gunja Rep't, at p. 7 ("The plaintiffs allege violence and retaliation by staff in their complaint. I did not find any specific proof of these allegations, and any allegations lacked appropriate support and were not substantiated, in my professional opinion. This was based on depositions and other documents I reviewed.").  The City's purported experts provide no substantiation nor any clear methodology for reaching their opinions, and such a deficiency provides yet another basis for excluding the City's experts' testimony.

## II.    Messrs. Hardinger's and Gunja's Testimony Should Be Excluded Because They are Fundamentally Unsupported and Will Be of No Assistance to the Jury

"[I]f [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." *Neb. Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416–17 (8th Cir. 2005) (citing *Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061 (8th Cir.2002)). This includes testimony that "fails to consider the relevant facts of [a] case," *id.* (citing *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1056 (8th Cir.2000)); "is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).  *See also Smith v. Toyota Motor Corp.*, No. 2:16-CV-24 ERW, 2018 WL 1299607, at *3 (E.D. Mo. Mar. 13, 2018) (same).  "[C]ases are legion that assert that expert testimony is inadmissible when it is based on speculative assumptions." *Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) (citations omitted).  "A certain amount

of speculation is necessary, an even greater amount is permissible (and goes to the weight of the testimony), ***but too much is fatal to admission***." *Id.* (citations omitted) (emphasis added).  In the same vein, where an expert testifies about the intent of an individual, or whether one version of events was more credible than another, courts reject such testimony on grounds that an expert is in no better position than the fact-finder to make such a determination.  *See, e.g.*, *Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995) (affirming district court's exclusion of expert testimony where appellant "fail[ed] to adequately explain how [expert]'s expertise . . . enable[d] him to testify [why one version of events was more credible than another]"); *see also Rightchoice Managed Care, Inc. v. Hospital Partners, Inc.*, No. 5:18-CV-06037-DGK, 2021 WL 3627938, at *2 (W.D. Mo. Aug. 16, 2021) (excluding portions of expert testimony where expert was "in no better position to ascertain the [] Defendants' intent than the jury" and "[p]ermitting her to testify about the [] Defendants' intent would only cast an impermissible 'aura of expertise' on a subject that needs no expert testimony.") (citations omitted); *United States v. Brazile*, No. 4:18-CV-00056 SEP, 2020 WL 5534452, at *9 (E.D. Mo. Sept. 15, 2020) (same).

When expert opinions exhibit such flaws, courts exclude them.  *See, e.g., RightChoice Managed Care*, 2021 WL 3627938, at *2 (finding expert's analysis "ignore[d] a substantial amount of evidence which contradict[ed] her conclusion," which "[wa]s fatal to admitting her opinion on this subject[,]" as "[t]he fact that she ignored or summarily dismissed this evidence indicates her opinion is not the product of reliable principles and methods, and that [she] has not reliably applied these principles and methods to the present case"); *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865–67 (8th Cir. 2010) (affirming exclusion of expert testimony, in part, on grounds that his "report relied on incorrect factual premises," which "indicate[d] [] he was either unaware of or disregarded [certain] facts" and thus "c[ould] offer no assistance to the jury"); *US Salt, Inc.*

15

*v. Broken Arrow, Inc.*, 563 F.3d 687, 691 (8th Cir. 2009) (affirming district court decision to exclude expert testimony where "he relied almost exclusively on . . . speculative estimates [favorable to his conclusion] without any independent verification; he conducted little if any investigation or analysis of [external] . . . conditions") (citations omitted); *Neb. Plastics, Inc.*, 408 F.3d at 417 (affirming district court's decision to exclude expert testimony on grounds expert "failed to take into account a plethora of specific facts" relevant to the issue).

As described below, Messrs. Hardinger's and Gunja's reports exhibit precisely these flaws and should therefore be excluded.

A. **Mr. Hardinger's Conclusions are Based on Assumptions and Unsupported by Sufficient Facts**.

Mr. Hardinger's conclusions are unsupported by sufficient facts and, instead, based upon assumptions amounting to improper speculation.  The crux of his opinion is that, even if conditions at MSI were unacceptable, the City recognized these problems in March 2017, created a list of proposed projects, and attempted to address them, which constituted a serious effort to ameliorate conditions at the jail.[9]  Specifically, Mr. Hardinger notes that the City created a list of proposed projects through Department of Public Safety's March 2017 Critical Items Report ("CIR") (Exhibit 6, CITY 0003951-0003980) and, from this, he concludes that these projects must have occurred *and* that "[t]hese projects . . . [must have] improved the overall conditions of the institution."  (Ex. 1, Hardinger Rep't, at p. 9.)  But the CIR consists only of detailed *proposals* and does not contain a single work order or subsequent inspection showing any of the proposed projects came to fruition (*see* Ex. 6, CITY 0003951-0003980), let alone succeeded in "improv[ing] the overall conditions

---

[9]   As an aside, even if true, this says nothing about conditions prior to March 2017, which makes sense, since Mr. Hardinger considered no documents for much of the class period prior to that date.  *See supra* § III(A).

of the institution." (Ex. 1, Hardinger Rep't, at p. 4.)

And the only other document Mr. Hardinger examined that could, in theory, provide a basis for such an opinion—the National Institute of Corrections' ("NIC") October 2018 Operational Assessment (*see* Ex. 1, Hardinger Rep't, at p. 10)[10]—makes clear that the CIR's suggestions were either (1) rejected (*compare* Ex. 6 at CITY 0003964 (CIR proposed MSI roof be replaced at cost of $1,650,000), *with* Exhibit 7 at CITY 0007497 (NIC report suggested roof was "repaired" but not replaced)); (2) left unaddressed (*compare* Ex. 6 at CITY 0003972 (CIR proposed $120,000 repair of "13 rooftop [A/C] units at MSI [because they] are all 20+ years old and are reaching end of life [and thus a ] . . . grave health and safety issue could develop quickly if a unit fails in the pods since windows do not open and there is no access to fresh air"), *with* Exhibit 7, CITY 0007485–0007526 (NIC report did not mention of replacing rooftop A/C units)); or (3) still pending at the time of the report. (*Compare* Ex. 6 at CITY 0003967 (CIR proposed $165,000 plumbing replacement as "remaining waste lines are 50 years old and at the end of their design life"), *with* Ex. 7 at CITY 0007497 (NIC suggested "[p]lumbing upgrades" were "approved and are ***pending***") (emphasis added).)[11]

Mr. Hardinger could have filled in the informational deficits here if had he actually inspected MSI. But, as he concedes, his one visit to MSI was solely to "help establish a visual

---

[10] Though Mr. Hardinger himself makes clear that that he would not unequivocally defer to NIC inspectors' opinions regarding conditions. (Ex. 2, Hardinger Dep. at p. 169:9-18.)

[11] In fact, as of August 2021, it appears that many of the issues flagged in the 2017 CIR that Mr. Hardinger assumes were remedied actually persist. *See, e.g.*, ECF Nos. 254-1, 254-2, 254-3 (Declarations of detainees recently incarcerated in MSI). Of course, if Mr. Hardinger had relied upon documents attesting to the fact that such repairs were performed, and subsequent inspections attesting to improved conditions, then this would simply be an issue of weight. But because Mr. Hardinger cites no such documents, it is not an issue of weight, but, rather, admissibility.

point of reference while reviewing . . . documents" and "become familiar with the layout of the facility and the overall conditions of [portions of the facility]."  (Ex. 1, Hardinger Rep't, at p.1.) By his own admission, he "did not formally inspect the MSI, conduct any tests or take any measurements, or interview staff or inmates" (*id.*; *see also* Ex. 2, Hardinger Dep. at p. 78:5-11); made no records concerning occupied PODS conditions (*id.* at p. 140:14-16); and admittedly did not consider his visit to constitute a comprehensive inspection of the property (*id.* at p. 86:1-3).

Then again, Mr. Hardinger's ability to obtain information was further encumbered by the City's poor recordkeeping system, detailed at length in Plaintiffs' motion for sanctions (ECF No. 180) and confirmed by Mr. Hardinger during his deposition:

> [Q.]    Do you know if MSI ever implemented a follow-up process to make sure that deficiencies were addressed? . . .
>
> A.     I had difficulty following what was listed as an issue or a concern [versus] what was duplication and what wasn't, what was fixed and when and by whom -- all [of which] . . . I think [is] very helpful in [] documenting that [officials] . . . kn[e]w what the problem [wa]s[] [and] we[]re going to systematically track that it was [addressed][,] [as] . . . that serves [] everyone's interest. ***I didn't find that day that they had really developed a really good tracking work order system***.

(Ex. 2 at pp. 174:19-21, 175:2-12 (emphasis added).)  This deficiency, of course, undercuts many of Hardinger's conclusions.  For instance, Mr. Hardinger admits that MSI's records make it difficult to discern how frequently ice and cold water were provided (*id.* at p. 177:2-5), yet he feels entirely confident in concluding that these measures demonstrate the City acted decisively to mitigate extreme temperatures.  (*Id.* at 176:19-177:1.)  But without knowing the frequency of ice and cold water delivery, this opinion becomes "entirely unsupported by facts" and, essentially, so unreliable as to provide no benefit to a jury.

**B.  <u>Mr. Gunja's Conclusions are Unsupported by Facts and are Based on Defendant's Unverified Statements</u>**

Mr. Gunja's opinions are so fundamentally unsupported by facts that they should also be

excluded.  Mr. Gunja's conclusions are based not upon his own observations but, rather, statements provided by the Defendants in this very case, which he accepts as true without any independent verification.[12]  (*See, e.g.*, Ex. 4, Gunja Rep't, at p.5 ("[***MSI Superintendent***] ***Carson*** was able to validate for me . . ."); *id.* at p. 6 ("***[MSI] Superintendent Carson*** stated all of the issues I identified had either been reported to his superiors for corrective action, were in the improvement stage for repairs, and/or were in a detailed report for facility upgrading"; *id.* at p. 8 ("[***MSI Superintendent***] Carson also advised me the city has been responsive to issues when he reported them." (emphases added).).[13]  Mr. Gunja's deposition provides further confirmation:

> Q. How did Mr. Carson validate those things for you?
>
> A. By telling me . . .
>
> Q. Okay. What did . . . did you do to confirm if Mr. Carson's statements were consistent with the actual practice at MSI?
>
> A. Talking to the staff, department heads, supervisors, unit managers, correctional officers.

(Ex. 5, Gunja Dep., at pp. 132:22-25, 133:5-9.)  Otherwise, the basis for his opinions are totally unexplained; at times, Mr. Gunja asserts he "was able to affirm" certain facts but offers no explanation ***how*** he did so.  (Ex. 4, Gunja Rep't, at p. 5)

And while Mr. Gunja at times tries to tie his conclusions to his site inspection, these "conclusions" are nothing more than speculative leaps.  For instance, Mr. Gunja states "[a]ll of the showers, plumbing fixtures, plumbing, and lighting in the dorms is in the process of being completely replaced"; "[w]hen issues arise pertaining to plumbing, water drainage, electrical

---

[12]  Or much cross-checking with detainees, either.  (*See* Ex. 4, Gunja Rep't, at p.5 ("I was limited on my interactions with inmates housed at the jail.")

[13]  To illustrate how improper this is, Plaintiffs note that the flipside of the above would entail Plaintiffs' experts basing their opinions solely upon the fact that "detainees were able to validate for [them] [certain issues regarding] the facility."  Plaintiffs surmise that the City would move to any such expert opinions as "fundamentally unsupported," and rightfully so.

systems, they are promptly reported and corrected"; and that "if there are issues [in places with inmates present][,] . . . [they] are either reassigned to another cell or dorm until the issues have been corrected." (*Id.* at p. 6.)  As a matter of common sense, a single, hours-long inspection would not allow an expert to reach any of these conclusions.  Rather, Mr. Gunja would be able to say only (1) that he observed ongoing work on plumbing and lighting ***not*** that he observed such systems being completely replaced, as this does not happen over the course of a few hours; (2) that he observed plumbing, water, and electrical problems being reported, and, if minor enough, perhaps might be corrected, ***not*** that this occurs as a general practice; and (3) that he observed inmates being reassigned to different areas if problems arose, ***not*** that this necessarily always occurs.  To the extent this leap is the product of MSI staff's assurances—which are inadmissible hearsay under Federal Rule of Evidence 703 offered for the truth of the matter asserted—that is an insufficient basis upon which to render an opinion about practices.

### III.   Mr. Hardinger's Testimony Should Be Excluded to the Extent It Opines on the Ultimate Legal Issue

While "expert testimony on industry practice or standards is admissible," *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003), "'[i]t is well-settled that experts may not offer legal conclusions about a case."[14] *Lombardo v. Saint Louis City,* No. 4:16-CV-01637-NCC, 2019 WL 414773, at *8 (E.D. Mo. Feb. 1, 2019) (citations and

---

[14]   And "just because an expert states he is not giving a legal opinion does not make it so."  *Gerling v. City of Hermann, Missouri*, No. 4:17-CV-02702 JAR, 2019 WL 7048972, at *4 (E.D. Mo. Dec. 20, 2019), *reconsideration denied*, No. 4:17-CV-02702 JAR, 2020 WL 619509 (E.D. Mo. Feb. 10, 2020), and *aff'd in part, rev'd in part and remanded*, 2 F.4th 737 (8th Cir. 2021) (citation omitted).  *See also Lombardo*, 2019 WL 414773, at *8 (excluding expert opinion because it opined on legal issue, even though expert report noted he "'[was] not a lawyer" and "[d]id not offer legal conclusions'")

quotations omitted); *see also In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005).  "[A] 'determination that a defendant's conduct constitutes a constitutional violation is a legal conclusion," *Zorich v. St. Louis Cty.*, No. 4:17-CV-1522 PLC, 2018 WL 3995689, at *2 (E.D. Mo. Aug. 21, 2018) (citation omitted), as is testimony using words implicating a legal test or standard.  *Lombardo*, 2019 WL 414773, at *8.  Such testimony is routinely excluded.  *See, e.g., id.* (excluding expert testimony "conclud[ing] . . . use of force was 'excessive' and 'unnecessary'" and "actions were 'unreasonable' or did not meet 'objective reasonableness' or appropriate governmental interests" because "reasonableness" and "excessiveness" under Fourth Amendment are questions of law) (citations omitted).  *See also Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (finding trial court's admission of police practices and procedures expert's testimony regarding "his views concerning the reasonableness of the officers' conduct in light of 'Fourth Amendment standards' . . . was not a fact-based opinion, but a statement of legal conclusion" and constituted reversible error); *Zorich*, 2018 WL 3995689, at *3 (excluding police policies and practices expert's testimony regarding reasonableness of defendant officers' actions as legal conclusions that invaded province of jury); *Swink v. Mayberry*, No. 4:17-CV-00791-PLC, 2018 WL 2762549, at *3 (E.D. Mo. June 8, 2018) (excluding police pursuit practices expert's opinion regarding whether officers' actions were reasonable under totality of the circumstances and given Fourth Amendment standards, and holding report and deposition inadmissible at trial because they were "inextricably linked with topics upon which he may not opine").

Here, Mr. Hardinger's report plainly assesses whether the conditions of confinement at the Medium Security Institute ("MSI") "meet **the Court established Standard of Care**."  (Ex. 1, Hardinger Rep't, at p.2 (emphasis added).)  Were that not enough, he later makes absolutely clear that his opinion pertains to whether the City met its "constitutional responsibilities:"

The City has not failed its ***Constitutional*** responsibilities to protect the health, safety, and welfare of those legally confined at the MSI.  At no time has the City or its agents been ***deliberately indifferent*** to the constitutional rights of those detained in the facility to be reasonably safe from serious harm.

(*Id.* at p. 9 (emphases added).)  This, of course, goes to the heart of Plaintiffs' six Constitutional claims (ECF No. 22, ¶¶ 178-202), all of which turn on the City's deliberate indifference.  (*Id.* ¶¶ 180, 183, 186, 189, 196, 202.)  Setting aside Mr. Hardinger's lack of qualifications for offering these legal opinions, Mr. Hardinger's testimony is an impermissible opinion on ultimate legal issues in this case and, accordingly, must be excluded.

### IV. Portions of Mr. Hardinger's Opinions, Testimony, and Reports Should Be Excluded Under Rule 702 Because They Are Based on Insufficient Facts, Data, and Expertise

"If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate."  *Neb. Plastics, Inc.*, 408 F.3d at 416.  Though Mr. Hardinger purports to provide an expert opinion on several categories of conditions from 2012 to the date of his report—including but not limited to medical treatment, food service, fire safety, climate control, air quality, and sanitation—he fails to consider significant portions of the record on these topics and in this timeframe, rendering his opinions "fundamentally unsupported" and inadmissible under Rule 702(b).  *Id.*  His testimony on such technical topics also must be excluded where Mr. Hardinger concedes he lacks formal training, or the "specialized knowledge" required to offer an expert opinion.  *See Shipp v. Murphy*, 9 F.4th 694, 701 (8th Cir. 2021).

### A. Mr. Hardinger Admits He Reviewed No Facts or Data Pertaining to Conditions at the Facility During 2012-2015[15]

Mr. Hardinger's opinions on conditions at MSI between 2012 and 2015 should be excluded

---

[15]  Mr. Hardinger concedes he offers no opinions on conditions at MSI from June 10, 2020 to present. *See generally* Hardinger Rep't; *see also* Hardinger Dep. at pp. 77:24-78:4.

because he fails to identify *any* materials from this timeframe on which he relies and bases his opinions.  Mr. Hardinger claims that "[t]he time frame covered in [his] report was determined by the dates of the earliest documents ***provided*** to [him], ***that is 2012, until present***"  (Hardinger Rep't, at p. 1 (emphasis added).)   But his report neither identifies nor analyzes any of the documents supposedly provided to him discussing conditions prior to 2016, nor does he address any specific conditions existing at MSI during this timeframe.  (*See generally id.*)   And his deposition testimony confirms as much, making clear he offers no opinions about conditions from 2012 to 2015:

> [Q.]  So you had mentioned this briefly, but just to be clear, are you offering an opinion in this case on the conditions of MSI specifically in 2012?
>
> A. No.
>
> Q. What about in 2013?
>
> A. No.
>
> Q. 2014?
>
> A. No.
>
> Q. 2015?
>
> A. No.

(Hardinger Dep. at pp. 82:22-87:7.)  Thus, although Mr. Hardinger's purported "expert opinion [is] based upon a thorough review and analysis of the documents" (Hardinger Rep't, at p.2), he clearly failed to consider the record addressing conditions at MSI between 2012 and 2015. (Hardinger Dep. At pp. 82:22-87:7.) Therefore, Mr. Hardinger has no sufficient basis upon which to offer an opinion for conditions at the facility in this 2012-2015 time period, and his testimony regarding the same should be excluded.

### B. <u>Mr. Hardinger's Testimony Regarding Certain Subject Areas Must Be Excluded for Failure to Examine Facts and Data (as Mr. Hardinger Concedes)</u>

While Mr. Hardinger purports to opine upon nearly all topics raised in Plaintiffs' complaint (Ex. 1, Hardinger Rep't, at p. 3), his report fails to offer specific opinions on a number of subjects.

As Mr. Hardinger confirmed during his deposition, he did not evaluate and is not offering an opinion on: security operations; use of force; PREA compliance; housing assignments; staff training; clothing and laundry; treatment programs and services, including recreation, education, visiting, self-help activities; or food safety. (Ex. 2, Hardinger Dep., at pp. 80:17-81:12; 85:6-15, 173:9-14.)  Without any discernible analysis or support, any opinions Mr. Hardinger purports to offer on these topics must be excluded.  *See United States v. Coutentos,* 651 F.3d 809, 820-21 (8th Cir. 2011) (affirming exclusion of expert testimony because expert failed to review "the facts of the case," including witness interviews, and her analysis was "unsupported by the record") (internal citation omitted).

### C. Mr. Hardinger's Testimony Regarding Certain Subject Areas Must Be Excluded Due to His Admitted Lack of Expertise

Again, though Mr. Hardinger clearly states he is opining upon nearly all topics raised in Plaintiffs' complaint (Ex. 1, Hardinger Rep't, at p. 3), he conceded during his deposition that he lacks any formal training in a number of areas: environmental health, including climate control, air quality, sanitation, and pest control air quality standards, and fire safety.  (Ex. 2, Hardinger Dep. at p. 83:17-25, 84:1-14, 85:2-5.)   Rule 702 "require[s] that the area of the witness's competence match the subject matter of the witness's testimony." *Shipp*, 9 F.4th at 701 (affirming exclusion of expert testimony where expert lacked specialized knowledge that would assist trier of fact) (internal citation and quotation omitted). Thus, to the extent Mr. Hardinger's report purports to opine on these topics for which he lacks specialized knowledge, such testimony must be excluded.

### CONCLUSION

For the foregoing reasons, both Messrs. Hardinger and Gunja failed in their testimony, opinions, and reports to satisfy the parameters required in the Federal Rules and the law governing

24

expert opinions, their reports, opinions, and testimony are inadmissible at any stage of this litigation, including but not limited to dispositive motions, class certification, and trial. This Court should thus grant Plaintiffs' motion.

Dated: October 15, 2021                    Respectfully submitted,

By: /s/ *Nathaniel R. Carroll*

**ARCHCITY DEFENDERS, INC.**
Matthew Dollan, (MBE #71867 MO)
Blake A. Strode (MBE #68422MO)
Jacki J. Langum (MBE #58881MO)
John M. Waldron (MBE #70401MO)
Nathaniel R. Carroll, (MBE #67988 MO)
Maureen G. V. Hanlon (MBE #70990MO)
Brandon L. Jackson (MBE #68159MO)
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1012
314-925-1307 (fax)
bstrode@archcitydefenders.org
jlangum@archcitydefenders.org
jwaldron@archcitydefenders.org
mdollan@archcitydefenders.org
ncarroll@archcitydefenders.org
mhanlon@archcitydefenders.org
bjackson@archcitydefenders.org

and

**DLA PIPER LLP (US)**
By: /s/ *Robert J. Alessi*
Robert J. Alessi (*Pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Phone: 212-335-4866
Fax: 212-335-4866
robert.alessi@dlapiper.com

Dennis Kiker (*Pro hac vice*)
2525 East Camelback Road, Ste 1000
Phoenix, AZ
Phone: 480-606-5100
Fax: 480-606-5101

dennis.kiker@dlapiper.com

Saher Valiani (MO Bar No. 69402)
33 Arch Street, 26th Floor
Boston, MA 02215
Phone: 617-406-6000
Fax: 617-406-6100
saher.valiani@dlapiper.com

*Attorneys for Plaintiffs*